**EXHIBIT F TO THE DECLARATION OF
PATRICK M. RYAN IN SUPPORT OF CISCO'S
OPPOSITION TO COUNTERDEFENDANTS'
MOTION TO STAY COUNTERCLAIMS**

**ORIGINALLY FILED UNDER SEAL**

**PUBLIC VERSION FILED PURSUANT TO COURT
ORDER OF FEBRUARY 23, 2011
(DOCKET ENTRY #281)**

**Gray Deposition Transcript, Vol. 1, pp. 1-89**

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLUMBIA

3

4      - - - - - - - - - - - - - - -

5    MULTIVEN, INC., a Delaware      )

6    Corporation,                    )

7            Plaintiff,              )

8    v.                              )

9                                    )  CIVIL ACTION NO.

10   CISCO SYSTEMS, INC.,            )  5:08-cv-05391 JW (HRL)

11   a California Corporation,       )

12            Defendant.             )

13   - - - - - - - - - - - - - - -

14

15                 ATTORNEY'S EYES ONLY

16          VIDEOTAPED DEPOSITION OF BASIL GRAY

17             THURSDAY, JUNE 17, 2010

18

19

20

21              BEHMKE REPORTING & VIDEO SERVICES

22                   BY:   RONALD E. BENNETT

23              160 SPEAR STREET, SUITE 300

24          SAN FRANCISCO, CALIFORNIA 94105

25                      (415) 597-5600

1

2

3

4

5

6

7

8              Videotaped Deposition of BASIL GRAY, taken on

9      behalf of DEFENDANT, at the law offices of Winston &

10     Strawn, LLP, 1700 K Street, N.W., Suite 1200,

11     Washington, D.C. commencing at 10:05 A.M., THURSDAY,

12     JUNE 17, 2010, before Ronald E. Bennett, Certified

13     Shorthand Reporter, pursuant to Notice of Videotaped

14     Deposition.

15

16

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES OF COUNSEL:

 2       FOR PLAINTIFF MULTIVEN, INC:

 3           CADWALADER, WICKERSHAM & TAFT, LLP

 4           BY:  JOSEPH J. BIAL, ATTORNEY AT LAW

 5           BY:  JUSTIN S. BRENNER, ATTORNEY AT LAW

 6           700 Sixth Street, N.W.

 7           Washington, D.C. 20001

 8           Telephone:  (202) 862-2391

 9           Email: joseph.bial@cwt.com

10

11       FOR MULTIVEN AND PETER ADEKEYE

12           ROPERS, MAJESKI, KOHN, BENTLEY

13           BY:  JAMES C. POTEPAN, ATTORNEY AT LAW

14           515 So. Flower Street

15           Suite 1100

16           Los Angeles, California 90071

17           Telephone:  (213) 312-2000

18           Email: jpotepan@rmkb.com

19

20

21

22

23

24

25
```

1   APPEARANCES OF COUNSEL - CONTINUED

2       FOR CISCO SYSTEM, INC.

3           WINSTON & STRAWN, LLP

4           BY:  PATRICK M. RYAN, ATTORNEY AT LAW

5           101 California Street

6           San Francisco, California 94111-5894

7           Telephone:  (415) 591-1400

8           Email: pryan@winston.com

9

10      ALSO PRESENT:  Jack Sherman, Videographer

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX

2    THURSDAY, JUNE 17, 2010

3    BASIL GRAY                                    Page

4      Examination by MR. RYAN                        7

5      Examination by MR. BIAL                       69

6      Examination by MR. RYAN                       86

7

8

9                          -o0o-

10

11            QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

12                      PAGE     LINE

13                          None.

14

15

16

17

18

19

20

21

22

23

24

25

1                          EXHIBITS

2                         BASIL GRAY

3    NUMBER                DESCRIPTION                PAGE

4    (None.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THURSDAY, JUNE 17, 2010; 10:05 A.M.

2

3          VIDEO OPERATOR:  Good morning.

07:12:58 4              Here begins Tape Number 1 in the deposition

10:05:18 5     of Basil Gray in the matter of Multiven, Incorporated

10:05:21 6     versus Cisco Systems, Incorporated, in the United

10:05:23 7     States District Court for Columbia, Case Number

10:05:27 8     508CV05391JWHRL.

10:05:36 9              Today's date is June 17, 2010.  The time

10:05:39 10    on the video monitor is 10:05 a.m.  The video

10:05:44 11    operator today is John Sherman, Behmke Reporting and

10:05:46 12    Video Services, 160 Spear Street, Suite 300, San

10:05:52 13    Francisco, California.

10:05:54 14             This video deposition is taking place at

10:05:57 15    1700 K Street, N.W., Washington, D.C., and was

10:06:02 16    noticed by Patrick M. Ryan of Winston & Strawn, LLP.

10:06:06 17             Counsel, please identify yourselves and

10:06:08 18    whom you represent.

10:06:09 19        MR. RYAN:  Patrick Ryan for Cisco.

10:06:14 20        MR. POTEPAN:  Jay Potepan for Multiven and Peter

10:06:17 21    Adekeye.

10:06:18 22        MR. BIAL:  Joseph Bial of Cadwalader, Wickersham &

10:06:20 23    Taft for Plaintiff, Multiven, Inc.  And joining me

10:06:24 24    today is my colleague Justin Brenner.

10:06:28 25

10:06:28  1      VIDEO OPERATOR:  The court reporter is Ron

10:06:28  2  Bennett, Certified Shorthand Reporter, Behmke Reporting

10:06:28  3  & Video Services.

10:06:28  4           Would the court reporter please swear in the

10:06:28  5  witness.

10:06:28  6

10:06:28  7                    BASIL GRAY,

10:06:28  8  having been first duly sworn, testified as follows:

10:06:28  9      THE WITNESS:  Yes.

10:06:42 10                    EXAMINATION

10:06:51 11  BY MR. RYAN:

10:06:53 12      Q.   Good morning.

10:06:54 13      A.   Good morning.

10:06:55 14      Q.   Please state your name for the record.

10:06:56 15      A.   It is Basil Gray.

10:07:00 16      Q.   My name is Patrick Ryan.  I represent Cisco

10:07:03 17  in this action, which is the Multiven and Sysco

10:07:07 18  lawsuit.  Before we get into the heart of the

10:07:10 19  deposition, I'll ask you a few background questions and

10:07:12 20  cover some basic deposition ground rules.

10:07:15 21           The deposition is a question and answer

10:07:17 22  session.  I want to be sure that you're cognizant of

10:07:20 23  all your rights and responsibilities related to a

10:07:23 24  deposition.

10:07:23 25           This case may go to trial.  Your

10:07:26  1    testimony is under oath.  It has the same force and

10:07:28  2    effect as if we were at trial and it can be used to

10:07:31  3    impeach you at trial; do you understand?

10:07:34  4         A.   I do.

10:07:35  5         Q.   Because we have discussed it here today, it

10:07:36  6    will be clear to the jurors, and for the judge, that

10:07:39  7    you have had a complete understanding of the process.

10:07:41  8    Do you understand?

10:07:42  9         A.   So far, yes.

10:07:44 10         Q.   Thank you.  Please answer audibly for the

10:07:47 11    court reporter.  Because the court report can't pick up

10:07:49 12    gestures.  Okay?

10:07:51 13         A.   Okay.

10:07:52 14         Q.   If you don't understand the question, be sure

10:07:54 15    to tell me.  If you answer, I'll assume you understood

10:07:56 16    the question.  Do you understand?

10:07:58 17         A.   Yes.

10:07:59 18         Q.   If you need to take a break, just let me

10:08:01 19    know.  And if a question isn't pending, we'll let you

10:08:04 20    take a break.  The most important thing is the answer

10:08:07 21    to the best of your ability.

10:08:09 22              You'll be given the opportunity to

10:08:11 23    review the transcript and make comments and make

10:08:13 24    changes.  But attorneys will be given a chance to

10:08:14 25    comment on the changes at trial, which could prove

10:08:16  1   embarrassing.  Thus, it's very important that you be as

10:08:20  2   accurate and truthful as possible today.  Do you

10:08:24  3   understand?

10:08:25  4        A.   Yes.

10:08:27  5        Q.   I'll be asking some questions that may seem

10:08:28  6   racy, but in the deposition setting they are routine.

10:08:32  7   In other words, if we were just having a beer, or we

10:08:35  8   were playing golf, I probably wouldn't ask you these

10:08:37  9   questions once we were real close friends.

10:08:37  10             Do you have any medical or physical

10:08:42  11  conditions that would prevent you from being able to

10:08:44  12  testify truthfully and accurately here today?

10:08:47  13       A.   No.

10:08:47  14       Q.   Are you taking any medication or under the

10:08:49  15  influence of any substances that might influence your

10:08:51  16  ability to testify truthfully and accurately today?

10:08:54  17       A.   No.

10:08:55  18       Q.   Have you had your deposition taken before?

10:08:56  19       A.   No.

10:08:59  20       Q.   Have you ever been a party in a lawsuit?

10:09:01  21       A.   No.

10:09:03  22       Q.   Have you been a witness in a court

10:09:05  23  proceeding?

10:09:05  24       A.   No.

10:09:06  25       Q.   You're a lucky man.  I would like to get to

10:09:12  1   know you a little bit.  Where did you grow up?

10:09:17  2        A.   I was a Navy person, so I moved every couple

10:09:21  3   of years.

10:09:22  4        Q.   So, your father was in the Navy?

10:09:25  5        A.   Yes.

10:09:26  6        Q.   Where did he serve?

10:09:30  7        A.   San Diego, Washington, D.C., Massachusetts,

10:09:35  8   Norfolk, Virginia.

10:09:38  9        Q.   What type of work did your father do in the

10:09:41 10   Navy?

10:09:41 11        A.   He was a surface line officer.

10:09:44 12        Q.   And what was the top rank he achieved?

10:09:47 13        A.   Commander.

10:09:49 14        Q.   And was your grandfather also in the

10:09:53 15   military?

10:09:54 16        A.   No.  Which grandfather?

10:09:58 17        Q.   Your father's father.

10:10:00 18        A.   No.

10:10:03 19        Q.   Your grandfather isn't the Pershing art

10:10:06 20   expert, is he?

10:10:07 21        A.   No.

10:10:07 22        Q.   I did a Google search.  Basil Gray is a

10:10:09 23   Pershing art expert.  I thought that was really cool.

10:10:11 24             So, you followed in your father's

10:10:19 25   footsteps in the Navy, I think, is that right?

10:10:21  1        A.    I did.

10:10:24  2        Q.    So, where did you go to high school; where

10:10:29  3    were you living when you went to high school?

10:10:31  4        A.    In Virginia Beach.

10:10:34  5        Q.    And where did you go to college?

10:10:36  6        A.    Jacksonville University.

10:10:39  7        Q.    What year was that roughly?

10:10:41  8        A.    I graduated in 1980.

10:10:43  9        Q.    And what did you do next?

10:10:46 10        A.    I was commissioned in the Navy.

10:10:48 11        Q.    So, were you in officer candidate school in

10:10:51 12    college or how did you get into the Navy?

10:10:54 13        A.    On Navy ROTC scholarship.

10:11:00 14        Q.    And so, what rank did you go into the --

10:11:04 15        A.    I was commissioned as an ensign.

10:11:08 16        Q.    What was your first job in the Navy?

10:11:13 17        A.    I went back to school for, learned to be a

10:11:16 18    supply officer.

10:11:18 19        Q.    If you could just describe in a nutshell your

10:11:22 20    career in the Navy I would appreciate it.

10:11:27 21        A.    I did 27 years in the Navy as a supply

10:11:30 22    officer, various tours, three ships.  Was stationed

10:11:37 23    overseas twice, had two commanding officer jobs.  Was

10:11:40 24    commanding officer in charge of logistics throughout

10:11:43 25    all SBEATS Asia, in Singapore at the Naval Regional

10:11:47 1   Contracting Center.  I was a commanding officer of

10:11:50 2   Defense Contract Management Command at Lockheed-Martin

10:11:53 3   Sanders up in Nashua, New Hampshire.

10:11:56 4          I was an assignment officer that

10:11:58 5   assigned officers for their next duty assignments.  I

10:12:01 6   was on the Joint Staff in the Pentagon.  I was on the

10:12:07 7   Secretary of the Navy staff.  That covers most of the

10:12:15 8   of the jobs.

10:12:17 9       Q.   Sounds like a very exciting career.

10:12:19 10      A.   It was an honor to serve.

10:12:21 11      Q.   What was the top rank that you achieved?

10:12:24 12      A.   I retired as a captain.

10:12:26 13      Q.   Thank you, very much for your service.  So,

10:12:30 14  at some point were you hoping to achieve flag rank or

10:12:36 15  was that --

10:12:37 16      A.   That was never a desire.

10:12:43 17      Q.   So, in those jobs, in your various role as

10:12:49 18  supply officer under your commands, did you get

10:12:52 19  involved in acquiring networking equipment for the

10:12:59 20  military?

10:13:00 21      A.   No.

10:13:00 22      Q.   Did you get involved in acquiring

10:13:04 23  communications equipment?

10:13:09 24      A.   I was the head of contracts at the Space and

10:13:13 25  Naval Warfare Systems Command.

10:13:13  1      Q.   That's in San Diego?

10:13:15  2      A.   That's in San Diego.  They are responsible

10:13:17  3  for acquiring command control and communications

10:13:19  4  equipment.  I oversaw the buyers that did that, but I

10:13:23  5  was not directly involved in any of the decisions on

10:13:27  6  the acquisitions that came to play.

10:13:29  7      Q.   So, when you say acquiring control and

10:13:35  8  communications equipment, what does that encompass?

10:13:37  9  Just give me an idea.

10:13:43 10      A.   Command control and communications equipment.

10:13:46 11  It's used through the military.

10:13:48 12      Q.   So, for example, if you have a Special Forces

10:13:54 13  units that is in Iraq and need to communicate with one

10:13:57 14  another, and they use various equipment to communicate

10:14:00 15  on the ground, whether it be amongst one another or to

10:14:05 16  bring in air support, would that be the kind of

10:14:08 17  equipment that would be purchased?

10:14:09 18      A.   Could be.

10:14:11 19      Q.   Can you give me some other kind of specific

10:14:13 20  examples of how that equipment might be used in the

10:14:15 21  military?

10:14:17 22      A.   Communicating from ship-to-ship, ship-to-air.

10:14:25 23  Communicating for managing systems on the ships, like

10:14:30 24  your disbursing systems or your supply systems to play.

10:14:40 25      Q.   So, would you view the quality and

10:14:44  1   reliability of that equipment to be vital to the proper

10:14:47  2   function of the military?

10:14:48  3        A.   Yes.

10:14:50  4        Q.   If that equipment fails, people can die,

10:14:55  5   correct?

10:14:54  6        A.   Yes.

10:15:05  7        Q.   So, what was the first thing you did after

10:15:08  8   you left the military?

10:15:13  9        A.   I took a job with PRTM Management

10:15:17 10   Consultants.

10:15:18 11        Q.   And what is PRTM?

10:15:20 12        A.   It's an international management consulting

10:15:22 13   company.

10:15:23 14        Q.   And what do you do for them?

10:15:28 15        A.   I'm in their government public sector group.

10:15:32 16   I consult to aerospace and defense and DOD and public

10:15:37 17   sector organizations.

10:15:39 18        Q.   Can you give kind of a day in the life

10:15:42 19   example of what you do?

10:15:48 20        A.   Companies, organizations come to be our

10:15:50 21   company with a problem and we try and solve it.

10:15:54 22        Q.   So, when you say a problem, you mean they

10:15:57 23   have got an issue with maybe the military or government

10:16:02 24   agency and they need help kind of navigating the

10:16:05 25   system, and you bring that expertise.  Is that the kind

10:16:09 1  of thing you do?

10:16:10 2       A.   Typically it's more of a operational strategy

10:16:13 3  type of issue and working with supply chain issues.

10:16:20 4       Q.   Can you give me an -- I'm just trying to put

10:16:23 5  this in kind of concrete terms.

10:16:25 6       A.   So, I have helped design an in end supply

10:16:27 7  chain architecture for the Department of Defense.  So,

10:16:30 8  it allows us to track supplies across the different

10:16:34 9  organizations to try and streamline, save money,

10:16:38 10 improve efficiency, reduce the cycle time that it takes

10:16:42 11 to respond in order to improve the readiness and reduce

10:16:45 12 the cost of supporting our war fighters.

10:16:48 13      Q.   So, you did that when you were in the private

10:16:49 14 sector?

10:16:51 15      A.   I am in the private sector.

10:16:52 16      Q.   Yes.  What I mean, so you were hired by the

10:16:55 17 DOD to do that, your firm?

10:16:58 18      A.   Yes.

10:16:59 19      Q.   Okay.  So, sometimes the government is your

10:17:01 20 client and sometimes the private sector is your client;

10:17:04 21 is that right?

10:17:04 22      A.   Yes.

10:17:05 23      Q.   Okay.  I understand.  That sounds like a

10:17:08 24 really exciting and important project.

10:17:11 25      A.   I enjoy it.

10:17:13 1      Q.   Are you still working in that project?

10:17:16 2      A.   I am.

10:17:17 3      Q.   Sounds like a project that could go on for

10:17:20 4  decades.

10:17:22 5      A.   The nature of our company is that we don't

10:17:25 6  try and stick around.  85 percent of our work is in the

10:17:30 7  commercial sector.  And that's about getting return on

10:17:33 8  investments, solving a problem and moving on.

10:17:36 9      Q.   So, did your work save the military money?

10:17:42 10     A.   Yes.

10:17:44 11     Q.   How much would you say in round figures

10:17:46 12 roughly?

10:17:50 13     A.   Hundreds of millions of dollars.

10:17:53 14     Q.   Thank you.  As a taxpayer, thank you, very

10:17:55 15 much.

10:17:56 16          So, tell me how you got involved in

10:18:08 17 Multiven?

10:18:09 18     A.   I was referred by a gentleman that I met out

10:18:11 19 in Singapore.  And Multiven interviewed me and asked if

10:18:19 20 I wanted to be on the board of directors.

10:18:21 21     Q.   Was that Wes Olson?

10:18:23 22     A.   It was.

10:18:24 23     Q.   Approximately when did you meet Wes in

10:18:26 24 Singapore?

10:18:31 25     A.   Probably in 2001.

10:18:34 1          Q.    How did you come to meet Wes?

10:18:38 2          A.    I was looking for ways to save the government

10:18:41 3    money in Singapore with improved log rec processes

10:18:48 4    where the ships request information and request

10:18:51 5    supplies and support services when they go into ships,

10:18:55 6    go into port.  And so, I was looking for a way to

10:18:58 7    streamline that process.  And Cisco has a consulting

10:19:04 8    group over there that was assisting with that, show us

10:19:08 9    what type of IT technology might be available.

10:19:12 10          Q.    So, this was IT technology to facilitate

10:19:16 11    better communications between ship-to-shore or between

10:19:20 12    ships, or both?

10:19:21 13          A.    Both.

10:19:23 14          Q.    What type of communication equipment are we

10:19:26 15    talking about -- audio or video or --

10:19:30 16          A.    No, it's primarily just data at the exchange.

10:19:40 17    You have a requisition for something and you have to

10:19:43 18    get it to the people that process that requisition and

10:19:46 19    to the suppliers.  And then, the suppliers need to bill

10:19:51 20    for that.  And then, they need to get paid for it.  So,

10:19:54 21    all of that was manually done for the most part.

10:20:00 22          Q.    Did something come of that relationship?

10:20:08 23          A.    The relationship?

10:20:09 24          Q.    With Cisco regarding this data stream

10:20:13 25    whatever?

10:20:14  1      A.   No.  Cisco provides that service free with

10:20:17  2  the idea that they will get business when you decide

10:20:21  3  how you are going to proceed.

10:20:24  4      Q.   So, at some point did Cisco get business

10:20:27  5  after you decided how you were going to proceed?

10:20:29  6      A.   Not that I know of.  I don't know whether or

10:20:32  7  not the project continued after I left.

10:20:34  8      Q.   Okay.  Was there something about getting

10:20:38  9  better access to the port there as well that you were

10:20:41 10  involved in?

10:20:45 11      A.   We built a new pier involved in Chi Nei Navy

10:20:49 12  base that allowed an aircraft carrier to go portside.

10:20:53 13      Q.   That was a significant system --

10:20:55 14      A.   Huge.

10:20:57 15      Q.   So, were you heavily involved in that project

10:21:00 16  as well?

10:21:02 17      A.   My folks were responsible for coordinating

10:21:04 18  that and overseeing that to make sure that it was on

10:21:09 19  track and scheduled.  It was built by the local

10:21:12 20  government, but it was intended for our use.

10:21:18 21      Q.   Very impressive project.  Let's see -- so,

10:21:23 22  let's get back -- so, you meet Wes Olson.  Does he talk

10:21:28 23  about Multiven then or did Multiven come about later?

10:21:33 24      A.   Later.

10:21:34 25      Q.   Did you stay in touch with Mr. Olson after

10:21:37 1  you first met him, become friends?  Just give us a

10:21:41 2  brief summary.

10:21:45 3       A.   Yeah, contact maybe a couple times a year,

10:21:50 4  just, hey, how you doing?  What are you up to?  He

10:21:56 5  moved back to the States.  I moved to San Diego and he

10:22:03 6  went on to some other jobs.  That was a casual contact.

10:22:10 7       Q.   Christmas card friends?

10:22:12 8       A.   Yes.

10:22:13 9       Q.   So, when did Multiven first come in the

10:22:17 10  picture?

10:22:24 11       A.   I'm thinking it was like 2005.

10:22:27 12       Q.   So --

10:22:29 13       A.   You probably know, but I don't.  Off the top

10:22:33 14  of my head I'm not sure.

10:22:35 15       Q.   Your best recollection is all we can ask for.

10:22:42 16  Maybe this will help.  Were you still in the Navy when

10:22:46 17  you started talking with Multiven?

10:22:51 18       A.   Yes.

10:22:52 19       Q.   Do you recall how long you had to go before

10:22:56 20  retirement, when you first started talking with

10:22:59 21  Multiven?

10:23:01 22       A.   It was probably a couple of years.

10:23:03 23       Q.   Okay.  You retired what year?

10:23:06 24       A.   2007.

10:23:07 25       Q.   So, that's how you get to 2005 approximately.

10:23:12  1                    So, tell us about your first contact

10:23:14  2    with Multiven itself.  Did Mr. Olson call up and say,

10:23:18  3    hey, there is this company.  I want to tell you about

10:23:21  4    it?

10:23:30  5        A.    I don't remember specifically.  I mean I know

10:23:33  6    for sure I got -- I got a call or an email asking if I

10:23:42  7    was interested and if I could fly out to Silicon Valley

10:23:46  8    for an interview.

10:23:49  9        Q.    And you did?

10:23:49 10        A.    I did.

10:23:53 11        Q.    Tell us what you found interesting or

10:23:55 12    appealing about Multiven at first blush?

10:24:00 13        A.    I knew I was going to be retiring.  I have

10:24:04 14    always wanted to broaden my horizons and try and learn

10:24:07 15    new things.  I didn't know what I wanted to do when I

10:24:12 16    retired.  It seemed like a neat learning experience.

10:24:17 17        Q.    Did the subject matter of the business

10:24:19 18    interest you or just the idea of being involved in a

10:24:23 19    text startup?

10:24:25 20        A.    I think just the idea of being involved in a

10:24:27 21    startup.

10:24:30 22        Q.    Tell us about what you remember about your

10:24:31 23    first meeting at Multiven.

10:24:36 24        A.    For the interview?

10:24:37 25        Q.    Yes.

10:24:41 1      A.   Peter was very friendly, very personable.

10:24:50 2  The welcoming it was just a very pleasant discussion.

10:24:59 3      Q.   When you say Peter, you are referring to

10:25:02 4  Peter Adekeye?

10:25:04 5      A.   Yes.

10:25:04 6      Q.   So, was it the typical interview, he asked

10:25:07 7  you a bunch of questions or was it more meet and greet

10:25:11 8  kind of thing?

10:25:18 9      A.    It wasn't a, you know, sit down across the

10:25:21 10 table and go through a checklist.  But it was an

10:25:25 11 interview all the same in terms of, I'm sure assessing

10:25:30 12 what type of demeanor I had, how I expressed myself,

10:25:35 13 trying to figure out whether or not, you know, we could

10:25:38 14 maybe work together.

10:25:41 15     Q.   Did you find Mr. Adekeye to be persuasive?

10:25:51 16     A.   I don't know that he was trying to persuade

10:25:54 17 me.  I think it was, you know, a matter of here's an

10:25:59 18 opportunity and see if it works.

10:26:05 19     Q.   So, did the two of you hit it off?

10:26:08 20     A.   Yes.

10:26:10 21     Q.   I take it he was favorably impressed with you

10:26:13 22 and your demeanor?

10:26:14 23     A.   Apparently.

10:26:15 24     Q.   And he wanted you to get involved?

10:26:17 25     A.   Yes.

10:26:17 1     Q.   So, what happened next with Multiven, as far

10:26:20 2  as you were concerned?

10:26:22 3     A.   Well, I, still being on active duty, I needed

10:26:26 4  to make sure that there wasn't a conflict of interest

10:26:30 5  and how that would proceed.  So, I checked with our

10:26:34 6  legal counsel to see if that was okay for me to do that

10:26:39 7  while I was on active duty.

10:26:41 8     Q.   When you say our legal counsel, you are

10:26:44 9  referring to the Navy JAG?

10:26:45 10    A.   Yes, Navy JAG.

10:26:49 11    Q.   And did they come back and say, it's okay,

10:26:51 12 with conditions, or what did they say?

10:26:57 13    A.   They came back basically saying that based on

10:27:00 14 the information that we know, this is good.  If the

10:27:05 15 situation changes, you need to let us be aware of that.

10:27:09 16 So we make sure there are, no issues develop.

10:27:13 17    Q.   When you say the situation, as it was at the

10:27:15 18 time, is that because at the time Multiven was not

10:27:18 19 bidding for government contracts?

10:27:22 20    A.   That's part of it.  And also because of the

10:27:25 21 position, I wasn't in a position to award companies or

10:27:28 22 make decisions on organizations for government

10:27:31 23 contracts.

10:27:35 24    Q.   Is that because your job involved acquisition

10:27:40 25 of products and not service contracts?

10:27:44  1      A.   Well, we look at the acquisition as service

10:27:48  2  or products.  But at the time that I was in that job I

10:27:51  3  was not involved in acquiring or making decisions about

10:27:56  4  acquisitions.

10:27:58  5      Q.   I see.

10:27:59  6      A.   Procurements.

10:28:00  7      Q.   So, at some point you had been involved in

10:28:02  8  procurements, but at this point in your career you were

10:28:04  9  no longer --

10:28:06 10      A.   Correct.

10:28:06 11      Q.   You just need to wait for me to finish the

10:28:08 12  question because it makes for -- his job harder.

10:28:11 13      A.   Got it.

10:28:12 14      Q.   I forgot to tell you that.

10:28:14 15      A.   Okay.

10:28:17 16      Q.   I always forget that.

10:28:24 17           So, they gave it a thumbs up and you

10:28:33 18  joined Multiven's board; is that right?

10:28:34 19      A.   Yes.

10:28:36 20      Q.   Was that in 2005 or sometime later?

10:28:41 21      A.   I'm not really sure how long that process

10:28:43 22  took.  It may have been early 2006.  Might have been in

10:28:51 23  2005.  I don't even know what time of year it was.

10:28:56 24      Q.   So, when you first joined the board, were you

10:28:58 25  excited about the opportunity?

10:29:00  1          A.   Yes.

10:29:02  2          Q.   And why were you excited about the

10:29:04  3  opportunity?

10:29:06  4          A.   It was a new experience, an opportunity to

10:29:08  5  learn something, an opportunity for me to see things on

10:29:12  6  another side other than the public sector.

10:29:16  7          Q.   At some point did you become disillusioned

10:29:19  8  with Multiven?

10:29:23  9          A.   Yes.

10:29:24 10          Q.   Why?

10:29:30 11          A.   I didn't feel like I was getting all the

10:29:33 12  information, and wasn't really sure what value or how I

10:29:38 13  was playing into the organization.

10:29:44 14          Q.   When you say, not getting all the

10:29:47 15  information, tell me -- can you elaborate on that.

10:29:52 16  What do you mean?

10:29:52 17          A.   Just I didn't know what was going on in the

10:29:55 18  organization.  And so, I felt left out.

10:30:05 19          Q.   Did you ask for information that you didn't

10:30:07 20  get?

10:30:07 21          A.   Yes.

10:30:08 22          Q.   Can you give me some examples?

10:30:10 23          A.   Financial information.

10:30:13 24          Q.   How often would you say you asked for

10:30:15 25  financial information and you didn't get it?

10:30:20   1        A.    Half a dozen at least times.

10:30:25   2        Q.    As a board member, who has a fiduciary

10:30:27   3   obligation to the company, did that disturb you?

10:30:32   4        A.    Yes.

10:30:35   5        Q.    Did you form an opinion as to why you thought

10:30:39   6   you weren't getting the financial information you were

10:30:41   7   asking for?

10:30:44   8        A.    No.

10:30:51   9        Q.    Did you ask why you weren't getting the

10:30:53  10   information you were seeking?

10:30:59  11        A.    I don't recall.

10:31:04  12        Q.    As part of your disillusion with Multiven,

10:31:11  13   did you become concerned that Multiven couldn't deliver

10:31:16  14   what it said it could deliver to its customers?

10:31:27  15        A.    No.  Although I never understood any of the

10:31:30  16   technical part of this.

10:31:34  17        Q.    So, I think I have seen an email where you

10:31:43  18   asked Mr. Adekeye something to the effect of how can

10:31:46  19   this guy be saying we have 15,000 feet on the street,

10:31:54  20   you know; do you remember something like that?

10:31:57  21        A.    That sounds familiar.

10:32:00  22        Q.    And do you remember what his response was?

10:32:07  23        A.    Not specifically, no.

10:32:12  24        Q.    Did that representation bother you, that they

10:32:15  25   were making that representation?

10:32:34 1      A.   You know, I don't know.  If he had given me a

10:32:40 2  response to that, it may have eased any concerns that I

10:32:44 3  have about misidentifying or misinformation.

10:32:50 4      Q.   So, let's talk about when you first

10:32:52 5  communicated your concern to him.  At that point you

10:32:55 6  did have a concern that that might be misleading to

10:32:58 7  customers, correct?

10:32:59 8      A.   Apparently.

10:32:59 9      Q.   And you say apparently because --

10:33:03 10     A.   I really don't recall the email.  It sounds

10:33:06 11  familiar, but I don't have good specific information on

10:33:10 12  it.

10:33:11 13     Q.   Are there any other examples that come to

10:33:14 14  mind where either you said to someone at Multven or

10:33:19 15  you sent an email saying, can we really deliver on

10:33:23 16  that?  Is that accurate?  Do you remember any other

10:33:26 17  examples like that?

10:33:29 18     A.   Not specific, but it wouldn't surprise me if

10:33:34 19  I did that.

10:33:35 20     Q.   It wouldn't surprise you because?

10:33:41 21     A.   Because I want to feel comfortable with

10:33:44 22  organizations and people that I'm involved in to make

10:33:49 23  sure, because it's my reputation on the line as well.

10:33:53 24     Q.   So, I want to talk about what you understood

10:33:56 25  about what Multiven did, at least on a basic level.  Or

10:34:01 1    at least purported to do.

10:34:06 2                    Do you understand that Multiven

10:34:09 3    purported to be able to provide service to, among other

10:34:17 4    things, customers who had high-end Cisco networking

10:34:21 5    equipment?

10:34:23 6         A.    Yes.

10:34:24 7         Q.    And did you also understand that Cisco

10:34:31 8    networking equipment is used in critical applications

10:34:36 9    such as military and airports and --

10:34:40 10        A.    Yes.

10:34:41 11        Q.    And would you agree that it's crucial that

10:34:45 12   the -- that anyone providing consulting or servicing

10:34:52 13   such products be highly qualified to do that work?

10:35:01 14        A.    Yes.

10:35:07 15        Q.    At some point did you become concerned that

10:35:16 16   Multiven might not be able to deliver across the board

10:35:21 17   high-quality service to such networking equipment?

10:35:29 18        A.    I don't think that was at the point where

10:35:32 19   there would be an issue.  I felt like Peter had the

10:35:35 20   skills to be able to deliver.  We didn't have the work

10:35:40 21   or the volume that he had to worry about whether or not

10:35:43 22   he had the surge capability to have enough people to be

10:35:46 23   able to respond to that.

10:35:47 24        Q.    So, when you say the surge capability, you're

10:35:50 25   talking about Peter could scale out what his

10:35:53  1    capabilities were?

10:35:54  2         A.   Correct.

10:35:56  3         Q.   So, when you said, we didn't have the work or

10:36:02  4    the volume, tell us about that.

10:36:08  5         A.   You know, as a start-up company, you start

10:36:12  6    with nothing.  And so, you have to get the sales in

10:36:19  7    order to bring that.  Cisco has a monopoly for the most

10:36:27  8    part on a lot of that and very, customers that

10:36:31  9    recognize that Cisco has a lot of power, and that is a

10:36:36 10    very cautious because of the criticality of those

10:36:39 11    systems.

10:36:39 12               Those are very difficult market to

10:36:42 13    enter for a new organization, a start-up company to

10:36:44 14    come in and try and offer some of these services.

10:36:50 15         MR. RYAN:  Objection.  Move to strike the

10:36:51 16    offering, the legal conclusion.

10:36:55 17         MR. BIAL:  I oppose the objection for the record.

10:36:59 18         MR. RYAN:  I have no doubt.

10:37:01 19         THE WITNESS:  I'm sorry.  What did I say

10:37:02 20    incorrectly?

10:37:03 21         MR. RYAN:  It's okay.  It's just lawyer talk.

10:37:06 22    Don't worry.

10:37:11 23          So, you said a number of things there.  I

10:37:13 24    would like to follow up on.  You said customers are

10:37:18 25    I think understandably very cautious about when they

10:37:22  1    are acquiring or doing business with a provider.

10:37:28  2    Tell us about that.  Why are they so cautious?

10:37:31  3         A.   Well, as you mentioned, these systems that

10:37:35  4    this equipment supports are critical pieces of

10:37:38  5    equipment that impacts the ability of a company to do

10:37:44  6    their job.  So, they take a lot of -- there is a lot of

10:37:51  7    concern to make sure the systems are up and running and

10:37:54  8    capable of performing like they need them to in order

10:37:57  9    to provide the service they promise their customers.

10:38:00 10    BY MR. RYAN:

10:38:00 11         Q.   Is it true, because these networking systems

10:38:04 12    are so critical to businesses and to the government,

10:38:06 13    whoever is using them, that they aren't going to want

10:38:12 14    to take a risk on someone or a business that might not

10:38:15 15    be able to deliver the high-quality service they need.

10:38:19 16    Is that correct?

10:38:21 17         A.   I think as a business they evaluate the risk

10:38:24 18    associated with it versus the cost savings and the

10:38:27 19    opportunity that they have with that.  That's part of

10:38:31 20    running a business is to determine the value

10:38:34 21    proposition.

10:38:36 22         Q.   To your knowledge, did Multiven run into the

10:38:38 23    issue, when companies would do that risk analysis, the

10:38:44 24    risk benefit analysis, and that those businesses came

10:38:48 25    to the decision that the risks did not, the risks

10:38:57  1   outweighed the rewards of doing business with them?

10:39:00  2        A.   Yes.

10:39:01  3        Q.   Can you think of specific examples?

10:39:08  4        A.   No, not off the top of my head.  I don't know

10:39:12  5   of the companies.

10:39:13  6        Q.   You remember occasions when Multiven would

10:39:17  7   try and attract a customer and the customer would say,

10:39:20  8   you know, it's just too risky for us to go with you.

10:39:24  9   You're an unproven commodity and we don't know that you

10:39:27 10   can deliver and protect our networks the way we need

10:39:30 11   them protected?

10:39:31 12        A.   Yes.

10:39:36 13        Q.   Putting on your objective hat, you know, not

10:39:38 14   an advocate for Multiven, did you understand where they

10:39:42 15   were coming from?

10:39:43 16        A.   Yes.

10:39:58 17        Q.   If you had been, let's say --

10:40:00 18        A.   I have a question.  You mentioned that I'm an

10:40:02 19   advocate for Multiven.  Is that how I'm viewed?

10:40:09 20        Q.   No.  I was going back in time when you were

10:40:11 21   on the board, I'm assuming you were thinking as an

10:40:13 22   advocate for Multiven.  I'm not trying to imply that

10:40:16 23   you are sitting here as an advocate for Multiven.  If I

10:40:21 24   did imply that -- I mean I don't know.

10:40:23 25        A.   I'm here to give honest testimony in terms of

10:40:26 1    what the courts need to make a decision.

10:40:29 2        Q.   I understand.  I appreciate it.  I'm grateful

10:40:32 3    for your time.

10:40:41 4              During your time at Multiven, before you

10:40:43 5    left Multiven, would you say that issue that we just

10:40:45 6    talked about was the biggest hurdle facing Multiven

10:40:50 7    getting business?

10:40:51 8        A.   Yes.

10:40:53 9        MR. BIAL:  I object to the form of the question.

10:41:01 10       MR. RYAN:  Court Reporter, when you review the

10:41:03 11   videotape, please make sure you listen carefully to the

10:41:07 12   audible because the answer came in before the

10:41:09 13   objection.  And I want to make sure the record is

10:41:12 14   accurate.

10:41:15 15       MR. BIAL:  Well, I -- just keep on.

10:41:24 16   BY MR. RYAN:

10:41:32 17       Q.   I would like you to go back to your days when

10:41:35 18   you were in charge of procuring equipment.  And let's

10:41:41 19   say your tasked with acquiring the communications for

10:41:48 20   the Special Forces in the Iraqi and Afghanistan wars.

10:41:55 21   And you are faced with going with a Cisco certified

10:42:05 22   partner for providing service to that equipment or

10:42:08 23   going with a business like Multiven.

10:42:19 24              Knowing what you know today about

10:42:23 25   Multiven, and based on all your experience in military,

10:42:26 1   can you think of any time when you would have selected

10:42:32 2   Multiven to support networking equipment used by

10:42:36 3   Special Forces in Iraqi and Afghanistan?

10:42:39 4        MR. POTEPAN:  Objection.  Form of the question.

10:42:40 5   Also incomplete.

10:42:44 6   BY MR. RYAN:

10:42:44 7        Q.   You may answer.

10:42:47 8        A.   I answer?

10:42:48 9        Q.   Yes.

10:42:50 10       A.   The way I would do an acquisition would be

10:42:52 11  based on what the requirements are stated in there.

10:42:54 12  For government contracts we have requirements to

10:43:01 13  support a small businesses and promote them and give

10:43:05 14  them an opportunity.

10:43:07 15            You specifically put in a requirement

10:43:08 16  to say that it was Cisco certified.  If that was a

10:43:13 17  requirement in the acquisition, okay, then I would

10:43:16 18  have to look to see whether or not the companies that

10:43:20 19  were competed had Cisco certification before I can

10:43:23 20  make the award.

10:43:25 21       Q.   And so, the answer to my question would be,

10:43:28 22  because Multiven never received any Cisco certification

10:43:33 23  that you know of, that you at no time under that fact

10:43:36 24  pattern would you have gone with Multiven; is that

10:43:39 25  correct?

10:43:39  1          A.   If Cisco certification was in the

10:43:43  2     requirement, and one of the competitors did not have

10:43:46  3     the Cisco certification, they would be nonresponsive to

10:43:51  4     the solicitation and would probably not make an award

10:43:54  5     to them.

10:43:57  6          Q.   So, when you are acquiring -- let's say when

10:44:00  7     you were acquiring products for uses like the ones we

10:44:05  8     are talking about, the Special Forces, is the ability

10:44:10  9     to deliver on the job high-quality service an important

10:44:18 10     criterion in deciding who to go with?

10:44:26 11          A.   When we are delivering equipment to

10:44:28 12     Special -- repeat the question again.

10:44:30 13          Q.   Acting as a procurement officer, acquiring

10:44:38 14     communications equipment for Special Forces in an

10:44:41 15     active war zone, is the ability to deliver on the

10:44:48 16     service of that equipment an important criterion in

10:44:51 17     deciding which company wins the bid?

10:44:59 18          A.   Ideally we want to buy equipment that doesn't

10:45:01 19     need service.  Because, when they are out there in the

10:45:07 20     field, you don't want defense scale.  If part of this

10:45:09 21     is requiring a service, you obviously want it to be

10:45:12 22     rapid and reliable and responsive because people's

10:45:16 23     lives would be on the line.

10:45:18 24          Q.   So, having said that, you wanted rapid,

10:45:26 25     responsive service, if something goes wrong, because

10:45:31  1    people's lives are on the line.

10:45:33  2                    Was Multiven in your mind ever in a

10:45:41  3    position to compete for that kind of work even if Cisco

10:45:47  4    certification was not a requirement?

10:45:50  5         A.   When I was associated with Multiven, our

10:45:52  6    target market was not the Special Forces, or DOD, or

10:45:56  7    critical systems like that.  It was primarily business

10:46:00  8    organizations.

10:46:00  9         Q.   I understand.  I would still like you to

10:46:04 10    answer the question, assuming that they were going

10:46:06 11    after such business.

10:46:08 12         A.   Okay.  So, repeat the question again.

10:46:09 13         Q.   Sure.  So, having said that you wanted rapid

10:46:31 14    responsive of service in case something goes wrong

10:46:34 15    because people's lives are on the line; for example,

10:46:36 16    when you are dealing with Special Forces in a war zone,

10:46:39 17    was Multiven in your mind ever in a position to compete

10:46:42 18    for that kind of work even if Cisco certification was

10:46:47 19    not a requirement?

10:46:48 20         MR. BIAL:  I'm going to object to the form of the

10:46:49 21    question.  Also object that the word compete is vague.

10:46:55 22         MR. RYAN:  You may answer.

10:46:58 23         THE WITNESS:  Yeah, I mean it's very -- it's a

10:47:04 24    very difficult question to answer.  Because there's a

10:47:08 25    whole huge set of scenarios.  I'm picturing a Special

10:47:12  1   Forces guy in the middle of the jungle with a radio

10:47:16  2   that goes down and is Multiven going to parachute in

10:47:19  3   there and fix the radio for them?  Probably not.  I

10:47:22  4   don't see them ever being in the position to do that.

10:47:26  5   BY MR. RYAN:

10:47:41  6      Q.   Do you know if, based on your experience, if

10:47:43  7   the government is allowed to specify that only Cisco

10:47:48  8   partners or certified partners can be vendors?

10:47:56  9      A.   That could be a specific requirement on a

10:48:00 10   single acquisition.

10:48:01 11      Q.   Have you heard of that as a specific

10:48:04 12   requirement?

10:48:05 13      A.   I haven't been involved really in the

10:48:07 14   statement of work of the requirements of those to know

10:48:10 15   whether or not that is.  I do know that we have similar

10:48:15 16   things where you are required to have to have a

10:48:20 17   specific knowledge or skill set in order to be able to

10:48:23 18   perform.

10:48:30 19      Q.   Tutor me a little bit on the government

10:48:32 20   bidding process.  Is the general rule that there's an

10:48:36 21   open bidding process, but the government is allowed to

10:48:41 22   layer exceptions on, if there are certain

10:48:44 23   justifications?  Is that correct?

10:48:45 24      A.   Sure.

10:48:47 25      Q.   Can you think of the kind of justifications

10:48:49  1    that the government can use for layering on specific

10:48:52  2    requirements?

10:48:54  3         A.   Compelling need, proprietary information,

10:49:02  4    existing presence, efficiencies that are gained from

10:49:07  5    using a certain organization because of its in the best

10:49:11  6    interest of the government.

10:49:12  7         Q.   National security?

10:49:13  8         A.   Absolutely.  That's a good catch all.

10:49:21  9         Q.   So, let's talk about networking equipment for

10:49:24 10    a moment, about how that might interplay into some of

10:49:30 11    those exceptions.

10:49:30 12              Is it important for the government to be

10:49:33 13    sure it's getting actually legitimate networking

10:49:37 14    equipment from the manufacturer and that it's not

10:49:39 15    acquiring counterfeit products or knock-off products

10:49:48 16    that may not be able to deliver what they think they

10:49:50 17    are buying?

10:49:51 18         A.   Counterfeit products are a big issue for

10:49:56 19    companies nowadays and a lot of concern.

10:49:59 20         Q.   Why are they a big concern?

10:50:02 21         A.   You want to know what is going into them.

10:50:05 22    Pharmaceuticals, for instance, they are having issues

10:50:09 23    with counterfeit drugs coming across and that has an

10:50:12 24    impact on people's lives.

10:50:16 25         Q.   So, looking at this networking equipment,

10:50:19  1   let's say you have got a router or a switch and it's

10:50:25  2   going into a nuclear powered submarine.  And it turns

10:50:28  3   out it's a counterfeit product and it fails during an

10:50:31  4   exercise.

10:50:34  5            That's something that whoever is

10:50:35  6   acquiring the products is going to try very hard to

10:50:38  7   avoid, isn't that right?

10:50:39  8       A.   Absolutely.  There's sub-safe items if that's

10:50:49  9   a nature that has to meet certain specifications.

10:50:55 10       Q.   I'm sorry.  Explain that to me.

10:50:55 11       A.   For submarines, as you mentioned, if it's

10:50:57 12   critical for the nature of the submarine there is a

10:50:59 13   term called sub-safe qualifications.  And all that

10:51:03 14   means it has to meet certain specifications.

10:51:05 15       Q.   So, for that particular thing there's

10:51:08 16   actually a specific kind of heightened requirement,

10:51:13 17   correct?

10:51:13 18       A.   Correct.

10:51:30 19       Q.   Did you ever receive or acquire any stock in

10:51:35 20   Multiven?

10:51:36 21       A.   Yes.

10:51:36 22       Q.   Can you give us kind of overview of the stock

10:51:39 23   you acquired?

10:51:41 24       A.   It was part of my compensation.  It was my

10:51:43 25   compensation for being on the board, was certain number

10:51:50  1    of shares of stock that were given over quarterly

10:51:56  2    increments.

10:51:58  3         Q.   Did you ever receive any other compensation

10:52:00  4    besides stock?

10:52:01  5         A.   No.

10:52:04  6         Q.   Do you remember whether any valuations were

10:52:10  7    placed on the stock you received?

10:52:14  8         A.   Well, at initial issue I think a penny a

10:52:18  9    share.

10:52:19  10        Q.   Do you remember how many outstanding shares

10:52:21  11   there were?

10:52:22  12        A.   No, I don't.

10:52:26  13        Q.   Does 100,000 ring a bell?

10:52:30  14        A.   I deal in hundred thousands all the time.

10:52:33  15   Might be.  I mean it was a round number.

10:52:38  16        Q.   So, did you ever discuss with anybody in

10:52:42  17   Multiven what the value of Multiven was?

10:52:45  18        A.   Yes.

10:52:46  19        Q.   Tell us about that.

10:52:51  20        A.   Just trying to determine what the value of

10:52:53  21   the IP that had been established over the process while

10:52:58  22   we were there.  Peter had had some software developed

10:53:03  23   and some capabilities.  And looking at what that would

10:53:11  24   actually be worth.

10:53:19  25        Q.   Did Mr. Adekeye ever say to you a specific

10:53:23  1    figure that he felt that Multiven was worth?

10:53:31  2         A.   Yes, but I can't remember.

10:53:37  3         Q.   Can't remember a ballpark?

10:53:40  4         A.   This is a guess.  I think ten million, maybe.

10:53:47  5         Q.   Ten million.  At the time when he told you

10:53:52  6    the number, whatever it was --

10:53:54  7         A.   I really am not sure about that.

10:53:57  8         Q.   At the time he told you what he thought the

10:54:00  9    valuation was, regardless of what the number was, did

10:54:05 10    you think that his valuation sounded reasonable?

10:54:11 11         A.   I didn't know the market to really know.

10:54:16 12    From what I have seen with IT and start-up companies I

10:54:21 13    think a lot of them have unrealistic costs and values

10:54:27 14    associated with them.  But they obviously have been

10:54:29 15    getting the money for them, as you see in Silicon

10:54:32 16    Valley and the IT startups.

10:54:38 17         Q.   Did you ever loan money to Multiven?

10:54:40 18         A.   Yes.

10:54:41 19         Q.   How much?

10:54:42 20         A.   $1,000.

10:54:43 21         Q.   When?

10:54:47 22         A.   Don't know.  Maybe 2007.

10:54:53 23         Q.   Do you remember why you loaned Multiven

10:54:56 24    money?

10:54:57 25         A.   They needed to pay the rent for the office

10:55:02  1    that they were using I believe.

10:55:04  2        Q.   Do you remember which office that was, what

10:55:07  3    the location was, street?

10:55:09  4        A.   No.

10:55:10  5        Q.   And were you told that Multiven was in danger

10:55:16  6    of being evicted, if you didn't loan Multiven a $1,000?

10:55:22  7        A.   Not if I didn't loan them, but it was in

10:55:25  8    danger of being evicted, yes.

10:55:27  9        Q.   So, if you loaned the $1,000, correct?

10:55:35 10        A.   Yes.

10:55:35 11        Q.   Did that prevent them from being evicted?

10:55:39 12        A.   My $1,000 alone did not, but I think they

10:55:43 13    were able to stay there because somebody else put some

10:55:46 14    money in.

10:55:47 15        Q.   Do you remember how much was put in besides

10:55:51 16    the $1,000?

10:55:52 17        A.   I don't.

10:55:56 18        Q.   Did it trouble you that Multiven was in a

10:55:59 19    position that it might get evicted?

10:56:01 20        A.   Yes.

10:56:04 21        Q.   Why did it trouble you?

10:56:07 22        A.   It's an indication of financial status of a

10:56:12 23    company.

10:56:15 24        Q.   That it's precarious?

10:56:17 25        A.   Yes.

10:56:25  1        Q.   Did you have any difficulty getting repaid?

10:56:30  2        A.   I was given stock in lieu of repayment.

10:56:36  3        Q.   Is that what you were expecting to get or

10:56:39  4   were you expecting to actually to get the money back

10:56:42  5   when you made the loan?

10:56:51  6        A.   I don't recall.

10:56:58  7        Q.   When you made the decision to accept stock in

10:57:01  8   lieu of $1,000, were you happy about that?

10:57:12  9        A.   When I made the loan for $1,000, I knew there

10:57:16 10   was a risk of losing that.  At least I had something.

10:57:23 11        Q.   Something is better than nothing?

10:57:26 12        A.   Yes.

10:57:27 13        Q.   Was Multiven borrowing money from other

10:57:38 14   people that you knew of besides yourself?

10:57:43 15        A.   They were borrowing money from other people.

10:57:49 16        Q.   By the way, what was the rate on that loan

10:57:55 17   that you made of $1,000?

10:58:03 18        A.   I don't recall.

10:58:10 19        Q.   Could it have been 10 percent?

10:58:12 20        A.   That rings a bell.

10:58:15 21        Q.   Were you aware about the same time that

10:58:17 22   Multiven was also borrowing money at much higher rates?

10:58:24 23        A.   That wouldn't surprise me.

10:58:26 24        Q.   Why wouldn't it surprise you?

10:58:32 25        A.   They need good collateral in order to get

10:58:35 1    good rates and start-up companies are going to have a

10:58:40 2    difficult time getting prime rates without something to

10:58:44 3    show for the money that somebody is going to loan them.

10:58:48 4        Q.   Do you recall whether Multiven took out a

10:58:55 5    loan with an individual for a percentage in excess of

10:59:00 6    20 percent?

10:59:01 7        A.   No.

10:59:04 8        Q.   Would it surprise you to learn that Multiven

10:59:06 9    had done so?

10:59:07 10       A.   No.

10:59:24 11       Q.   What was the straw that broke the camel's

10:59:27 12   back that made you to decide to dissolve your

10:59:30 13   relationship with Multiven?

10:59:50 14       A.   You know, the final determination was really

10:59:53 15   based on my time and effort and the value that I was

10:59:58 16   receiving from this.  I had since retired.  I was

11:00:03 17   working for a consulting company.  I really had a much

11:00:07 18   better appreciation for the value of my time.

11:00:14 19            And so, I was looking at time

11:00:18 20   invested, where the opportunities were going, how

11:00:20 21   things were proceeding, and decided that it wasn't --

11:00:26 22   I wasn't getting the value or felt like I was adding

11:00:29 23   the value, so it was time to leave.

11:00:35 24       Q.   You had a very distinguished career in the

11:00:36 25   military, very honorable career obviously.  At some

11:00:43 1  point did you think that Multiven, at least your

11:00:47 2  association with Multiven, could possibly tarnish your

11:00:53 3  reputation?  If so, did that play a role in your

11:00:56 4  decision to leave the board?

11:00:58 5      MR. BIAL:  Objection as to form.

11:01:00 6      MR. RYAN:  You may answer.

11:01:01 7      THE WITNESS:  Yes.

11:01:01 8  BY MR. RYAN:

11:01:03 9      Q.  Tell us about what you were thinking along

11:01:06 10  those lines?

11:01:11 11      A.  I was seeing things where I was told things

11:01:13 12  and what I was told wasn't happening.  Also, as I

11:01:20 13  mentioned, when I was asking for like financial

11:01:22 14  information and data, I wasn't getting it.

11:01:27 15          And even in the time when I loaned the

11:01:31 16  money, there was just a total different attitude and

11:01:36 17  an approach to me as merely -- I was feeling more

11:01:43 18  like a tool rather than a participant within the

11:01:47 19  company and that's when I started questioning my

11:01:51 20  value to the organization and my worth.

11:02:08 21      MR. RYAN:  Let's take a short break.

11:02:10 22      (Discussion off the record.)

11:16:05 23  BY MR. RYAN:

11:16:12 24      Q.  At some point -- I take it with your long

11:16:19 25  career in the military that you developed a lot of very

11:16:22  1    important contacts in and out of the government and in

11:16:26  2    the business world?

11:16:28  3         A.   Yes.

11:16:29  4         Q.   At some point did you attempt to use those

11:16:32  5    contacts to develop sales leads for Multiven?

11:16:36  6         A.   No, not so much.

11:16:44  7         Q.   Did you make any efforts to make contact with

11:16:46  8    Multiven with some of those contacts that you

11:16:48  9    developed?

11:16:51 10         A.   Say that again.

11:16:52 11         Q.   Did you make any efforts to make contacts for

11:16:56 12    Multiven with some of your contacts?

11:16:58 13         A.   Yes.

11:16:58 14         Q.   What was the purpose of that?

11:17:03 15         A.   To -- couple of things; one is, they were

11:17:09 16    looking for other people to advise them.  And I would

11:17:15 17    talk to people that I knew that I considered smart

11:17:20 18    about this type of business to get their opinion in

11:17:23 19    terms of whether or not it was relevant or not.

11:17:27 20         Q.   When you say whether or not it was relevant

11:17:30 21    or not, what do you mean by that?

11:17:31 22         A.   Whether or not it was a good business

11:17:34 23    proposition and what they thought about it.

11:17:36 24         Q.   So, in other words, whether it was a viable

11:17:39 25    business idea?

11:17:40 1        A.   Yes.

11:17:42 2        Q.   Did you get some responses back that some of

11:17:44 3   the contacts didn't think it appeared to be a viable

11:17:48 4   business idea?

11:17:49 5        A.   Yes.

11:17:52 6        Q.   Who were some of those contacts that said

11:17:54 7   that?

11:17:55 8        A.   I don't remember the names.

11:17:58 9        Q.   But they were people that you trusted and

11:18:01 10  thought were smart about business; is that correct?

11:18:07 11       MR. BIAL:  Object to form and smart, vague.

11:18:11 12       THE WITNESS:  Yes.

11:18:12 13  BY MR. RYAN:

11:18:25 14       Q.   Were you involved with any conversations with

11:18:29 15  potential investors in Multiven?

11:18:31 16       A.   Yes.

11:18:32 17       Q.   Do you remember any of those?

11:18:43 18       A.   No, I can't remember the guy's name.

11:19:02 19       Q.   Do you know who John Steadman is?

11:19:05 20       A.   Yes.

11:19:06 21       Q.   Who is he?

11:19:07 22       A.   He's a retired admiral that I used to work

11:19:10 23  for.

11:19:10 24       Q.   Is he someone you discussed Multiven with?

11:19:13 25       A.   Yes.

11:19:14 1        Q.   Do you remember what he had to say about

11:19:16 2   Multiven?

11:19:17 3        A.   He knew a guy that was kind of a smart IT

11:19:22 4   person that could talk to, to get his ideas on that.

11:19:30 5        Q.   Do you remember who that person was?

11:19:31 6        A.   I don't remember his name.

11:19:32 7        Q.   Did you actually talk to that person?

11:19:34 8        A.   Yes.

11:19:34 9        Q.   And do you remember what they said?

11:19:40 10       A.   I ended up making an introduction with him

11:19:44 11  and Peter.

11:19:48 12       Q.   Did something come of that introduction?

11:19:50 13       A.   I don't think so.

11:19:58 14       Q.   Did you ever have occasion to learn about any

11:20:04 15  immigration issues that Mr. Adekeye might have?

11:20:09 16       A.   Yes.

11:20:10 17       Q.   Tell us what you remember about that?

11:20:14 18       A.   He was held up in London for some immigration

11:20:21 19  disputes.

11:20:24 20       Q.   When you say, he was held up, you mean he

11:20:27 21  couldn't get back to the United States?

11:20:29 22       A.   I think he was trying to return back to the

11:20:33 23  United States.

11:20:33 24       Q.   Something to do with immigration was

11:20:36 25  preventing him from coming?

11:20:37 1        A.   Yes.

11:20:38 2        Q.   Do you know anything more about immigration

11:20:40 3    issues with respect to Mr. Adekeye?

11:20:42 4        A.   No.

11:20:45 5        Q.   When was the last time that you saw Mr.

11:20:47 6    Adekeye in the United States -- roughly?

11:20:57 7        A.   Maybe in 2007.

11:21:03 8        Q.   How often did you see Mr. Adekeye in person?

11:21:16 9        A.   Four or five times.

11:21:18 10       Q.   Did you typically communicate on the phone or

11:21:21 11   by email?

11:21:24 12       A.   Email and Skype calls.

11:21:32 13       Q.   Is Skype something you use regularly or is

11:21:34 14   that something Mr. Adekeye used regularly?

11:21:37 15       A.   He introduced me to Skype.

11:21:40 16       Q.   And based on your experience with him, is

11:21:44 17   Skype something that Mr. Adekeye, at least when you

11:21:47 18   knew him, used it regularly?

11:21:51 19       A.   I don't know who else he used it with.  We

11:21:54 20   used it for board meetings.

11:22:05 21       Q.   I want you to exclude occasions when Multiven

11:22:09 22   lawyers were present or able to participate in a

11:22:14 23   conversation.  Did you ever discuss with anyone the

11:22:24 24   lawsuit that Multiven brought against Cisco?

11:22:29 25       A.   Yes.

11:22:31  1      Q.   Tell us what you remember about those

11:22:33  2  discussions.

11:22:35  3      MR. BIAL:  Object to any attorney privileged

11:22:40  4  communications this will touch upon.  We'll let it

11:22:45  5  continue for a little bit here.

11:22:47  6  BY MR. RYAN:

11:22:47  7      Q.   You may answer.

11:22:48  8      A.   What prompted it was a, I got a phone call

11:22:51  9  from one of Cisco's attorneys, I don't remember the

11:22:56 10  name, telling me that there was a lawsuit between

11:22:59 11  Multiven and Cisco.

11:23:03 12           And I'm like -- news to me.  And I

11:23:08 13  called Peter and I said, hey, you know, what is up

11:23:13 14  with this?  I think it would have been just a common

11:23:17 15  courtesy to have given me a heads up rather than me

11:23:20 16  getting a blindside phone call from somebody on this.

11:23:25 17      Q.   So, you were upset that you didn't know about

11:23:27 18  it from Peter; is that correct?

11:23:29 19      A.   Yes.

11:23:31 20      Q.   What else can you remember about that

11:23:33 21  conversation with Mr. Adekeye?

11:23:42 22      A.   It wasn't much more.  I mean -- he wanted to

11:23:52 23  know what I told the attorneys when I talked to them.

11:24:04 24  And I don't remember much more about the conversation.

11:24:08 25      Q.   Did he describe the lawsuit or tell you

11:24:10  1   anything about the lawsuit?

11:24:15  2        A.   He may have touched a little bit on it but --

11:24:23  3        Q.   Did you have any additional conversations

11:24:24  4   with anybody from Multiven about the lawsuit other than

11:24:28  5   that conversation?

11:24:33  6        A.   No.  I'm sorry.  Matt Goldberg had called me

11:24:38  7   and asked --

11:24:40  8        Q.   He's a lawyer for Multiven, correct?

11:24:44  9        A.   Well, he was.  And then, he, now he actually

11:24:48 10   works for them as the head of the sales team or

11:24:54 11   something.

11:24:55 12        Q.   So, in your mind he was in sales and not

11:24:59 13   acting as a lawyer?

11:25:00 14        A.   Not acting as an attorney.

11:25:03 15        Q.   So, you had a conversation with him that was

11:25:05 16   not a legal conversation, but something else about the

11:25:09 17   law suit; is that correct?

11:25:11 18        A.   He wanted to know if I had any information --

11:25:12 19        MR. BIAL:  Wait.  I'm going to instruct the

11:25:14 20   witness here.  The determination as to whether

11:25:16 21   something is attorney/client communications is not

11:25:20 22   adequate for Mr. --

11:25:23 23        MR. RYAN:  I'll strike the question and ask some

11:25:25 24   foundational stuff so we can establish.

11:25:29 25        When was this conversation?

11:25:35 1        A.   I'll be honest, I don't even remember how

11:25:37 2   long ago this lawsuit -- was it in 2008?

11:25:42 3   BY MR. RYAN:

11:25:42 4        Q.   December 2008.

11:25:44 5        A.   Okay.

11:25:45 6        Q.   At the time of the conversation with

11:25:47 7   Mr. Goldberg, were you on the board of Multiven?

11:25:51 8        A.   I don't think so.

11:25:58 9        Q.   When you had the conversation with

11:26:00 10  Mr. Goldberg, was there anything that indicated that he

11:26:06 11  was acting as a lawyer for Multiven when he called you?

11:26:11 12       A.   No.

11:26:12 13       Q.   Okay.  What did he say to you?

11:26:16 14       MR. BIAL:  I'm going to object.  Mr. Gray's

11:26:21 15  opinion as to what constitutes legal advice isn't going

11:26:24 16  to be determined by your assumption that it's not legal

11:26:29 17  advice.

11:26:30 18        So, I'm going to instruct the witness not --

11:26:32 19  he's not going to be able to answer questions unless

11:26:35 20  you develop additional foundation, which you can do.

11:26:38 21  But just to ask him what he told him is not

11:26:41 22  sufficient to establish that that's not

11:26:41 23  attorney-client privileged information.

11:26:44 24  BY MR. RYAN:

11:26:45 25       Q.   Is Mr. Bial representing you today?

11:26:48  1          A.   No.

11:26:48  2          MR. BIAL:  He's a former employee, former board

11:26:50  3   member, high ranking at Multiven.  And you're talking

11:26:54  4   about information from the general counsel,

11:26:56  5   conversations about him that could have touched upon

11:26:59  6   his relationship while he was a former board member at

11:27:02  7   Multiven.

11:27:04  8          Q.   Let me ask him another question.  During this

11:27:07  9   conversation, did you talk about things that happened

11:27:12 10   when you were a board member?

11:27:15 11          A.   No.

11:27:17 12          Q.   Please tell me what he said.

11:27:19 13          A.   He just said he was going to be sending an

11:27:22 14   email, that there was a requirement to provide any

11:27:24 15   information that existed on Multiven for part of this

11:27:30 16   case.  I said, hey, all the stuff I have is in my

11:27:34 17   Multiven email account.

11:27:42 18          Q.   Have you had any discussions with anyone else

11:27:44 19   about the Multiven-Cisco lawsuit?

11:27:51 20          A.   No.

11:27:54 21          Q.   Have you ever been interviewed by someone

11:27:57 22   from Federal Law Enforcement about Multiven?

11:28:08 23          A.   Yes.  In general Federal Law Enforcement,

11:28:12 24   right, is Secret Service.

11:28:17 25          Q.   Please tell us about that.

11:28:19  1        A.   Received a phone call, a voice mail to

11:28:23  2    contact Secret Service regarding some investigation

11:28:30  3    done on Peter.  And I think it is related to

11:28:38  4    information from, that Cisco had relayed or asked

11:28:41  5    about.

11:28:44  6        Q.   Do you remember what you said to the Secret

11:28:46  7    Service agent?

11:28:56  8        A.   No, I really didn't have much information to

11:29:00  9    share.  They wanted to know where Peter might be

11:29:03 10    getting information from.  And said, you know, I don't

11:29:08 11    know other than from the paint --

11:29:15 12        Q.   Did you say anything like, I had become

11:29:24 13    suspicious that Multiven really wasn't a viable

11:29:27 14    business given the few employees and the amount of

11:29:31 15    capabilities that I had observed?

11:29:33 16        MR. BIAL:  Object to form of the question.

11:29:37 17    BY MR. RYAN:

11:29:38 18        Q.   You can answer.

11:29:44 19        A.   I don't know that I said it like that.  I

11:29:47 20    think I was wondering whether or not there was, you

11:29:50 21    know, it was going to make it.

11:29:54 22        Q.   What do you mean by that?

11:29:55 23        A.   Just because from what I had seen they

11:29:59 24    weren't making any sales.  And you had to make sales in

11:30:04 25    order to maintain a business.

11:30:06  1        Q.   Do you remember anything else you might have

11:30:08  2   said to the Secret Service agent?

11:30:11  3        A.   No.

11:30:17  4        Q.   When you left the Multiven board, did anyone

11:30:22  5   ask you to delete any information from your computer

11:30:28  6   about Multiven?

11:30:29  7        A.   No.

11:30:42  8        Q.   If while you were a member of the board of

11:30:45  9   Multiven you had learned that Mr. Adekeye had used a

11:30:52  10  Cisco employee password to access proprietary

11:30:56  11  information on Cisco's network and download software,

11:31:00  12  would you have resigned?

11:31:03  13       A.   If I knew that to be a fact, yes.

11:31:11  14       Q.   That's because you're an honorable person and

11:31:13  15  you wouldn't want to be associated with a business that

11:31:15  16  would do that sort of thing; is that right?

11:31:18  17       MR. BIAL:  Object to the form of the question.

11:31:20  18       Q.   You may answer.

11:31:20  19       A.   My reputation is very important to me.

11:31:31  20       Q.   I would like to go back to your days as a

11:31:35  21  procurement officer.  When you were a procurement

11:31:41  22  officer, was one of your jobs to review contracts and

11:31:45  23  bid proposals for a variety of vendors?

11:31:48  24       A.   No.

11:31:48  25       Q.   So, what did you do as a procurement officer?

11:31:51  1       A.    I managed those people that did that.

11:31:54  2       Q.    Did you ever actually do the line work where

11:31:58  3   you reviewed the contracts?

11:32:00  4       A.    Not typically, no.

11:32:03  5       Q.    So, when you managed these folks, did you

11:32:08  6   develop an expertise about what went on with the work

11:32:11  7   so you could make sure they were doing their job

11:32:14  8   properly?

11:32:14  9       A.    Yes.

11:32:16 10       Q.    Tell us how you went about that.

11:32:22 11       A.    Big on process improvements and weaning out

11:32:27 12   inefficiencies within processes.  So, for instance, at

11:32:31 13   SPA war what I developed was a interactive flow chart

11:32:39 14   of the process for going through contracts that allowed

11:32:42 15   the contracting people to click on whatever they needed

11:32:47 16   and it would drill down and provide the information to

11:32:49 17   help them, make sure that they had the right formats,

11:32:53 18   the decision criteria that they would need and how it

11:32:56 19   actually played into the overall process.

11:32:58 20       Q.    So, you had a strong overview and expertise

11:33:02 21   of kind of the whole process of procurement within the

11:33:06 22   military, correct?

11:33:11 23       A.    Yes.  I look at things, tend to be from a --

11:33:15 24   I'm a manager and a leader.  I rely on the technicians

11:33:20 25   to give me the specifics on things to do.  But I know

11:33:25  1   about the interrelationships and how to try and achieve

11:33:30  2   an objective.

11:33:35  3        Q.   At some point you held the title of director

11:33:37  4   of contracts; is that right?

11:33:39  5        A.   Correct.

11:33:40  6        Q.   Tell us about what your day-to-day shop was

11:33:43  7   like, when you were director of contracts?

11:33:48  8        A.   A lot of it was dealing with programs,

11:33:53  9   dealing with companies, trying to put together

11:33:58  10  acquisition strategies how to capitalize on the limited

11:34:03  11  resources we had to fulfill a mission.  So, if we

11:34:07  12  didn't have enough contracting people, we had to find

11:34:09  13  ways to streamline the process.

11:34:16  14            We would deal with questions,

11:34:20  15  Congressional inquiries that would maybe come in.

11:34:22  16  And then, I deal with my department heads in terms of

11:34:29  17  how they were proceeding on the contract so they

11:34:32  18  needed to get awarded.

11:34:34  19       Q.   In order to perform that role, you had to

11:34:35  20  have kind of a broad breadth of knowledge about the

11:34:38  21  entire procurement process from the top to bottom, sort

11:34:42  22  of an overview knowledge?

11:34:44  23       A.   (Nods affirmatively.)

11:34:53  24       Q.   Correct?

11:34:54  25       A.   Correct.  True.

11:35:01 1          Q.   I had an ambiguous response on the

11:35:03 2     transcript.  That's why I was making sure.

11:35:16 3                    So, going back to your original, I think

11:35:19 4     you called it interview with Mr. Adekeye.  Was anyone

11:35:22 5     else present at that meeting?

11:35:40 6          A.   I don't think so.

11:35:42 7          Q.   Who else that, was or is affiliated with

11:35:46 8     Multiven have you met with in person?

11:35:51 9          A.   His wife, Deka, Matt Goldberg, and Mark

11:36:07 10    Wippich.  And then, I walked through the office and met

11:36:15 11    some of the admin staff through there, but I don't

11:36:19 12    recall their names.

11:36:20 13         Q.   You're talking about the college interns?

11:36:27 14         A.   Yes.

11:36:28 15         Q.   Have you communicated with other people

11:36:30 16    associated with Multiven besides Mr. Adekeye using

11:36:33 17    Skype?

11:36:45 18         A.   Matt Goldberg and Mark Wippich may have been

11:36:48 19    on -- Mark Wippich has been on some of the calls.

11:36:52 20         Q.   Let's talk about these individuals.  You

11:36:54 21    mentioned Mr. Adekeye's wife.  Is that Deka -- you

11:36:58 22    said?

11:36:59 23         A.   Yes.

11:37:00 24         Q.   What do you remember about her?

11:37:04 25         A.   At the time when first met she was a student

11:37:14  1    and was kind of doing some marketing support work for

11:37:19  2    him part time.  Then, I think when she graduated, she

11:37:24  3    came over and took over one of the departments, I guess

11:37:27  4    the marketing department, or something within the

11:37:30  5    company.

11:37:31  6         Q.   At some point did you form an opinion

11:37:34  7    regarding her capabilities?

11:37:42  8         A.   I questioned her capabilities, when Peter was

11:37:48  9    looking at putting her in as a position in the company.

11:37:52 10         Q.   And why did you question her capabilities?

11:37:55 11         A.   Because I hadn't seen a resume or didn't know

11:38:00 12    that much about what her skill level was and what she

11:38:03 13    was going to bring to the table.  And naturally,

11:38:05 14    because there was a personal relationship in there, I

11:38:09 15    thought it was important to question him in terms of,

11:38:12 16    is this a smart business decision or is this a

11:38:17 17    relationship decision that is driving you to put her in

11:38:20 18    this position.

11:38:21 19         Q.   You said she was a student, correct?

11:38:23 20         A.   Yes.

11:38:24 21         Q.   Was she a student at San Francisco State

11:38:26 22    University?

11:38:27 23         A.   Maybe.

11:38:28 24         Q.   Did Peter ever tell you that he had paid part

11:38:31 25    of her expenses using is Cisco credit card?

11:38:37  1          A.    No.

11:38:39  2          Q.    You mentioned that you walked through the

11:38:40  3    office at some point.  Do you remember if that was the

11:38:43  4    office in Palo Alto or Red Stone City?

11:38:53  5          A.    I went through definitely the one Red Stone

11:38:58  6    City, that was the last one that I went through.

11:39:03  7          Q.    Did you go through the other office in Palo

11:39:05  8    Alto?

11:39:06  9          A.    Yes.

11:39:07 10          Q.    Can you describe the office in Palo Alto?

11:39:19 11          A.    It was on the, maybe second or third floor.

11:39:22 12    It's kind of cubicles.  I think it was right along on

11:39:30 13    the interstate there.

11:39:32 14          Q.    Do you remember how many people were working

11:39:34 15    there?

11:39:36 16          A.    Just a couple.

11:39:41 17          Q.    Have you ever seen more than a couple people

11:39:44 18    working at Multiven?

11:39:49 19          A.    No.

11:39:51 20          Q.    Now, you mentioned Mark Wippich.  Who is Mark

11:39:55 21    Wippich?

11:39:57 22          A.    Mark was one of the investors.  And then, he

11:40:03 23    was brought in to kind of lead the sales and try and

11:40:09 24    create sales for the company.

11:40:13 25          Q.    You said he was an investor.  Do you know how

11:40:16  1    much money he invested?  Do you know whether he was a

11:40:24  2    large investor, small investor, what size investor?

11:40:29  3         A.   You know, one of the things that I never had

11:40:33  4    visibility in is who all invested and how much they

11:40:38  5    invested in there.  I'm sure he was much larger than

11:40:42  6    what I had invested of $1,000.

11:40:46  7         Q.   That was one of the issues you had, because

11:40:48  8    as a member of the board, you felt you should be

11:40:51  9    entitled to review that kind of information, correct?

11:40:53 10         A.   Yes.

11:41:04 11         Q.   Did you have any discussions with Mr. Wippich

11:41:07 12    about Multiven's business and its viability?

11:41:16 13         A.   Yes.

11:41:17 14         Q.   Tell us about what you remember.

11:41:22 15         A.   I was wondering what was making it difficult

11:41:24 16    have to have sales, what he thought about the

11:41:29 17    technology and the value proposition of the company,

11:41:33 18    whether or not it was -- had an opportunity to make,

11:41:38 19    you know, he was out talking to potential customers.

11:41:41 20    He got to hear firsthand what was driving their

11:41:45 21    decisions.

11:41:46 22         Q.   Do you remember what his response was?

11:41:47 23         A.   Well, I think he believed in it or he

11:41:52 24    wouldn't have been involved.  And he did make the

11:41:56 25    comment about, you know, it's difficult because all

11:42:00 1    these companies are uncomfortable trying something new.

11:42:10 2    They don't want to risk taking a chance.

11:42:14 3        Q.   So, he said words to the effect, we are not

11:42:18 4    getting contracts to service the networking products

11:42:25 5    because the potential customers don't want to take a

11:42:27 6    risk on something new?

11:42:29 7        A.   And they don't want to upset Cisco.

11:42:32 8        Q.   So, the answer to my question is, yes, and

11:42:34 9    they don't want to upset Cisco, correct?

11:42:36 10       A.   Yes.

11:42:47 11       Q.   Do you remember a discussion with Peter about

11:42:50 12   whether Ms. Yussuf was going to be a president or vice

11:42:56 13   president?

11:42:56 14       A.   No.

11:43:01 15       Q.   Do you know whether Ms. Yussuf became

11:43:05 16   responsible for the financials at Multiven's employ?

11:43:14 17       A.   I don't recall.

11:43:18 18       Q.   Now, it was Mr. Olson that got you involved

11:43:24 19   with Multiven, right?

11:43:25 20       A.   Yes.

11:43:25 21       Q.   After you had your interview and you joined

11:43:28 22   the board, did you have much communication with Mr.

11:43:31 23   Olson after that?

11:43:32 24       A.   I think I talked to him maybe once or twice

11:43:35 25   after that.  Actually, maybe more than that.  Half a

11:43:41 1   dozen times.

11:43:42 2       Q.   Tell us what you remember about when those

11:43:44 3   conversations took place and what was said that you can

11:43:47 4   remember?

11:43:48 5       A.   Well, I mean the initial conversations after

11:43:52 6   I joined the board, we just talked about, you know, the

11:43:56 7   opportunity, what was happening with the organization.

11:44:00 8   Then, as time progressed, he was expressing his

11:44:04 9   frustration with Peter.

11:44:07 10              He had invested some money in the

11:44:12 11  company, and the expiration date, or the due date for

11:44:19 12  these things to be repaid had expired, and he was

11:44:22 13  trying to get the money back and was having a

11:44:27 14  difficult time with that.

11:44:32 15              So, that's how it sort of progressed.

11:44:35 16  So, it went from supportive of Multiven to being

11:44:41 17  somewhat of a, very disappointed with the way he was

11:44:45 18  being treated and the way things were going.

11:44:50 19      Q.   So, let's talk about the timeframe you would

11:44:57 20  have been visiting Multiven's offices.  It was roughly

11:45:00 21  sometime in 2005 and when would have been probably the

11:45:05 22  last time you would have been in Multiven's offices?

11:45:09 23      A.   Maybe 2007.

11:45:10 24      Q.   During that period of time how many times

11:45:15 25  roughly would you say that you visited Multiven's

11:45:19  1    offices?

11:45:22  2        A.    Two or three times total.

11:45:25  3        Q.    Total?

11:45:25  4        A.    Yes.

11:45:25  5        Q.    So, on any of those occasions was Mr. Olson

11:45:31  6    at Multiven's office, when you visited between 2005 and

11:45:35  7    2007?

11:45:35  8        A.    No.  No, I don't think so.  It's hard to

11:46:00  9    remember.

11:46:00 10        Q.    What other discussions do you remember having

11:46:02 11    with Mr. Olson about Multiven after he became

11:46:05 12    disenchanted with Multiven?

11:46:15 13        A.    I think he was more disenchanted with Peter

11:46:18 14    than he was with Multiven, although they are pretty

11:46:22 15    much one in the same.

11:46:27 16        Q.    When you say they are pretty much one in the

11:46:29 17    same, are you referring to the fact that he controls

11:46:34 18    the company both from an ownership and a management

11:46:36 19    point of view?

11:46:38 20        A.    Yes.

11:46:45 21        Q.    Do you have any idea whether Mr. Adekeye's

11:46:50 22    money is segregated from the company's money?

11:46:54 23        MR. POTEPAN:  Objection to form.

11:46:57 24        MR. RYAN:  You may answer.

11:46:59 25        THE WITNESS:  No.

11:47:00  1    BY MR. RYAN:

11:47:01  2        Q.   At some point did you become concerned that

11:47:04  3    Mr. Adekeye might be just using Multiven as a personal

11:47:07  4    tool rather than as a viable business?

11:47:10  5        MR. BIAL:   Objection to form.   Object to the

11:47:12  6    personal tool as vague.

11:47:13  7        MR. RYAN:   You may answer.

11:47:20  8        THE WITNESS:   I was concerned about how Multiven

11:47:23  9    might be -- was being used and how it was developing.

11:47:40 10    BY MR. RYAN:

11:47:41 11        Q.   Were there things that, as a member of the

11:47:45 12    board, that you had to approve?

11:47:53 13        A.   Issue of stock to people.   I think is

11:48:01 14    probably the only thing I remember voting on.

11:48:05 15        Q.   Were there other members of the board, when

11:48:09 16    you were sitting on the board?

11:48:17 17        A.   There was one guy that lasted maybe a week.

11:48:23 18    Jovae something -- and he got in an argument with Peter

11:48:30 19    and resigned.

11:48:31 20        Q.   Do you know what the argument was about?

11:48:35 21        A.    It was, I think it was in the technical realm

11:48:40 22    because, Jovae, however you say his name, was very

11:48:44 23    technically oriented in terms of networks and

11:48:47 24    information.

11:48:51 25        Q.   You testified that you were concerned about

11:48:52  1    how Multiven was being used.  Why were you concerned?

11:49:01  2         A.   Well, because I didn't see it generating

11:49:04  3    income or getting sales.  And then, it spun off another

11:49:12  4    company which seemed to be getting all the attention.

11:49:25  5         Q.   Wouldn't you agree that corporations are

11:49:27  6    supposed to make profits for their shareholders?

11:49:30  7         A.   Yes.

11:49:30  8         Q.   That is supposed to be the goal?

11:49:32  9         A.   Yes.

11:49:32 10         Q.   Are there any other ways you were concerned

11:49:34 11    about the way Multiven was being used?

11:49:37 12         A.   No.

11:49:51 13         Q.   Have you heard anything about whether

11:49:56 14    Multiven might have illegally required software from

11:50:01 15    Cisco?

11:50:02 16         A.   No.

11:50:05 17         Q.   Have you heard anything about whether

11:50:09 18    Multiven might have acquired products in the secondary

11:50:17 19    markets that were formerly manufactured by Cisco that

11:50:21 20    might not be legitimate products?

11:50:25 21         A.   No.

11:50:46 22         Q.   You testified that Multiven had spun off a

11:50:50 23    company that was getting all the attention.  You mean

11:50:53 24    that the spinoff company was getting all of Mr.

11:50:56 25    Adekeye's attention?

11:50:57  1        A.    Yes.

11:50:57  2        Q.    And is that company Insa?

11:51:06  3        A.    Yes.

11:51:20  4        MR. RYAN:  Let's take a short break.  I don't have

11:51:23  5   a lot more to cover with you.  I just want to go

11:51:26  6   through my notes.

11:51:28  7             (Brief Recess.)

12:04:24  8        VIDEO OPERATOR:  We are back on the record at

12:04:27  9   12:04.

12:04:35 10        MR. BIAL:  Before you start your questioning I

12:04:37 11   want to designate this attorneys eyes only until I have

12:04:42 12   an opportunity to review his testimony.

12:04:45 13        MR. RYAN:  Which part?

12:04:47 14        MR. BIAL:  I think we talked about potential

12:04:49 15   customers and more importantly the way Multiven

12:04:53 16   approaches identifying potential customers.

12:05:01 17        MR. RYAN:  When are you going to let us know which

12:05:04 18   parts you want?

12:05:05 19        MR. BIAL:  I'm going to stay within the four

12:05:07 20   corners of the protective order.  I think Section 5.

12:05:17 21        MR. RYAN:  All right.  Well, the court reporter is

12:05:19 22   on an expedited basis, so it will be making his life a

12:05:25 23   lot easier if you make your decision.

12:05:28 24        MR. BIAL:  As I say, we'll stay with the

12:05:30 25   protective other.  I just don't want to end up having

12:05:31  1    the stuff in a filing before we have an opportunity to

12:05:33  2    review it to make sure there's not sensitive

12:05:35  3    information there.

12:05:40  4    BY MR. RYAN:

12:05:41  5         Q.   Do you know somebody named Dawn who got

12:05:44  6    involved for a period of time with Multiven?

12:05:47  7         A.   Yes.

12:05:47  8         Q.   Who is that person?

12:05:50  9         A.   Dawn Mirek.  Is that who you are referring

12:05:53  10   to?

12:05:55  11        Q.   I think so.  Who is she?

12:05:57  12        A.   She is a former employee of AOL and

12:06:05  13   considered pretty knowledgeable in IT and networking.

12:06:12  14        Q.   When did you meet her?

12:06:19  15        A.   Probably in 2006.

12:06:23  16        Q.   Do you remember how you met her?

12:06:26  17        A.   Met through a mutual friend.

12:06:30  18        Q.   Did you introduce her to Mr. Adekeye?

12:06:32  19        A.   Yes.

12:06:33  20        Q.   Did she become a member of Multiven's

12:06:36  21   Advisory Board?

12:06:37  22        A.   Yes, I think that was her title.

12:06:40  23        Q.   Besides Dawn were there other members of the

12:06:43  24   Advisory Board?

12:06:47  25        A.   Not to my recollection.

12:06:51  1          Q.   Did Dawn meet Mr. Adekeye in person?

12:07:00  2          A.   I don't know.

12:07:04  3          Q.   Do you remember ever seeing them together

12:07:06  4     physically?

12:07:07  5          A.   I don't recall, no.  I don't believe so.  No,

12:07:15  6     I don't recall seeing them together.

12:07:20  7          Q.   You mentioned Mr. Wippich.  Was he still at

12:07:25  8     Multiven when you left Multiven's board?

12:07:29  9          A.   No.

12:07:31 10          Q.   Do you remember approximately how long before

12:07:37 11     you left Multiven's board he left Multiven?

12:07:44 12          A.   Maybe a year.

12:07:46 13          Q.   Do you remember anything about the

12:07:47 14     circumstances of his departure from Multiven?

12:07:55 15          A.   Can you be more specific?

12:07:56 16          Q.   Do you remember why he left?

12:08:00 17          A.   He wasn't making any sales.

12:08:04 18          Q.   Did you have any discussions with Mr. Wippich

12:08:07 19     about why he was leaving Multiven?

12:08:12 20          A.   No, not -- not that I recall.

12:08:18 21          Q.   When you say he wasn't making any sales, how

12:08:20 22     did you know he wasn't making any sales?

12:08:24 23          A.   Because, when we had the board meetings, we

12:08:27 24     would always ask, hey, do we have any sales?  And there

12:08:31 25     were rarely any to report.

12:08:37  1        Q.   Do you know, have you heard of a company

12:08:39  2   called Tour Pacific?

12:08:43  3        A.   Name sounds familiar but I don't know -- is

12:08:47  4   that where Mark went?  You ask the questions.  Sorry.

12:08:55  5        Q.   Very perceptive.  When you decided to leave

12:09:00  6   the board, did you tell Mr. Adekeye in person or over

12:09:04  7   the phone, over Skype?

12:09:07  8        A.   I think I sent an email.

12:09:11  9        Q.   Do you remember what was said?

12:09:18 10        A.   No.  You know, basically I think I spend my

12:09:26 11   time in resources and efforts elsewhere on this.

12:09:32 12        Q.   Do you remember if Mr. Adekeye reacted to you

12:09:36 13   saying you were leaving?

12:09:37 14        A.   Do I remember what?

12:09:38 15        Q.   That Mr. Adekeye reacted to you saying you

12:09:42 16   were going to leave?

12:09:43 17        A.   I think he was somewhat ambivalent about it.

12:09:48 18        Q.   Do you remember ever having any

12:09:50 19   communications with Mr. Adekeye about the fact that

12:09:56 20   some of the people that did work with Multiven used

12:10:01 21   aliases so that their employers wouldn't know they were

12:10:08 22   working with Multiven?

12:10:09 23        A.   No.

12:10:10 24        Q.   Do you remember an email handle

12:10:12 25   omar@Multiven.com?  Does that ring a bell?

12:10:18  1        A.    No.

12:10:20  2        Q.    Do you remember a name umairbuddaboy?

12:10:28  3        A.    That one sounds familiar.  I actually, I

12:10:30  4    think that one I got an invitation to be on, linked in

12:10:35  5    with.

12:10:37  6        Q.    Is that something recent or --

12:10:39  7        A.    No, back when I was on the board.

12:10:44  8        Q.    Do you remember if Umair went by a different

12:10:46  9    name when he worked at the Multiven so his employer

12:10:49 10    wouldn't know he was working with Multiven?

12:10:52 11        A.    No.  I don't know who he was.  I didn't

12:10:55 12    accept the invitation to be on linked in.  If that was

12:11:02 13    the same person.  It was a name similar to that.

12:11:11 14        MR. RYAN:  All right.  For the time being I'm

12:11:13 15    suspending my questions.  And see if counsel for

12:11:18 16    Multiven have any questions.

12:11:20 17        MR. BIAL:  We just have a couple of questions.

12:11:23 18    Why don't we take a very quick break and I can sit up

12:11:28 19    over here.

12:11:29 20            (Discussion off the record.)

12:13:18 21        VIDEO OPERATOR:  We are back on the record at

12:13:20 22    12:13.

12:13:22 23                        EXAMINATION

12:13:23 24    BY MR. BIAL:

12:13:29 25        Q.    I guess we are shortly afternoon.  So, good

12:13:32 1      afternoon.

12:13:33 2                     Mr. Gray, just a couple of questions I

12:13:35 3      would like to ask following up on some of your

12:13:38 4      testimony earlier.  I just want to touch on your

12:13:41 5      relationship with Mr. Olson.  Can you repeat again when

12:13:46 6      approximately Mr. Olson suggested that you might join

12:13:50 7      the board of Multiven?

12:13:53 8          A.   I believe it was in 2005.

12:14:00 9          Q.   How did you know Mr. Olson at that point in

12:14:03 10     time?

12:14:03 11         A.   I had met him when I was stationed in

12:14:07 12     Singapore.  And that was from -- I was in Singapore

12:14:10 13     from 2000 to 2002.  And then, we maintained casual

12:14:15 14     contact throughout that time.

12:14:18 15         Q.   What was Mr. Olson doing in Singapore in 2000

12:14:21 16     to 2002?

12:14:22 17         A.   He was working for Cisco.  And an

12:14:26 18     organization that they provide consulting services to

12:14:31 19     companies and organizations.

12:14:35 20         Q.   Do you recall what his title was by any

12:14:37 21     chance?

12:14:38 22         A.   I don't.  Probably consultant.

12:14:43 23         Q.   What was your opinion of Mr. Olson at that

12:14:45 24     time?

12:14:45 25         A.   I really respected him.

12:14:48   1      Q.   Did you respect him for his technical

12:14:50   2   capabilities?

12:14:51   3      A.   I liked him as a person.  I liked him in

12:14:54   4   terms of the way he approached problems and issues.  I

12:14:57   5   enjoyed working with him and discussing things within

12:15:05   6   common business practices and ways to approach things.

12:15:08   7      Q.   Did you have a business relationship with him

12:15:10   8   at that point in time 2000-2002?

12:15:13   9      A.   Yes.

12:15:14   10      Q.   And then, how did that relationship continue

12:15:17   11   after 2002?

12:15:18   12      A.   Now, keep in mind, a business relationship in

12:15:21   13   the fact that we were working business, but it was, you

12:15:27   14   know, not -- he wasn't hired by me.

12:15:31   15      Q.   Okay.  You had discussions about business

12:15:33   16   with him?

12:15:34   17      A.   Yes.

12:15:35   18      Q.   About Cisco's business?

12:15:38   19      A.   No.  Really the service that he provided was

12:15:42   20   to provide knowledge and expertise about what the realm

12:15:47   21   of possibility is for incorporating information

12:15:52   22   technology solutions and to help solve programs.  So,

12:15:55   23   it wasn't specifically Cisco directed.

12:15:58   24      Q.   If Mr. Olson were engaged in a project, would

12:16:01   25   he provide specific technical recommendations about

12:16:04 1    what could be done with communications for that

12:16:06 2    project?

12:16:07 3         MR. RYAN:  Objection.  Lack of foundation.  Calls

12:16:09 4    for speculation.

12:16:12 5    BY MR. BIAL:

12:16:12 6         Q.    You can answer.

12:16:13 7         A.    So, he would provide examples of commercial

12:16:19 8    best practices and solutions that had been done before

12:16:22 9    and what type of technology may be available to help

12:16:25 10   solve the problems that we were trying to deal with.

12:16:28 11        Q.    And you thought he did a good job?

12:16:30 12        A.    Yes.

12:16:31 13        Q.    At the time that Multiven was recommended to

12:16:36 14   you in 2005, was the business relationship with Mr.

12:16:41 15   Olson the same as it had been previously?

12:16:44 16        A.    No.

12:16:45 17        Q.    Can you explain what the relationship was

12:16:47 18   like in 2005?

12:16:48 19        A.    The business relationship with Mr. Olson, you

12:16:53 20   know, really terminated when I left Singapore.  So,

12:16:56 21   that would have been in 2002.  And maybe even sooner.

12:17:01 22   He may have left before I did.

12:17:05 23               So, in 2005, again, from the business

12:17:10 24   relationship and just being part of an Xpac society

12:17:15 25   within Singapore we developed somewhat of a

12:17:18  1    friendship.  So, that's how I would say that

12:17:22  2    friendship was in 2005.

12:17:26  3         Q.   Had anything happened between 2000 and 2002,

12:17:30  4    2005 to change your opinion about Mr. Olson?

12:17:33  5         A.   No.

12:17:37  6         Q.   You testified earlier that you had an

12:17:40  7    interest in Multiven for one reason that it might be,

12:17:44  8    "a neat learning experience"?

12:17:49  9         A.   Yes.

12:17:49 10         Q.   And I believe, please correct me if I wrong,

12:17:51 11    your testimony was, you were going to be going into

12:17:54 12    retirement and you were searching an opportunity to

12:17:57 13    start private business at that point?

12:17:59 14         A.   Yes.

12:18:05 15         Q.   What did Mr. Olson tell you about Multiven

12:18:07 16    that captured your interest?

12:18:11 17         A.   He said it was, you know, a new technology, a

12:18:21 18    new approach to solutions, and that Peter was one of

12:18:27 19    the best technicians experts on network systems that he

12:18:30 20    had ever known.

12:18:37 21         Q.   Any reason to doubt what he was telling you?

12:18:40 22         A.   No.

12:18:42 23         Q.   When you say it was a new approach to

12:18:44 24    solutions, are you talking about the potential business

12:18:48 25    to service Cisco hardware and software?

12:18:54  1        A.    At that point we never even talked about

12:18:56  2    Cisco.  It was Multiven, which stands for multi

12:19:03  3    vendors.  And I had never even really made a

12:19:10  4    correlation or anything to the fact that it would

12:19:13  5    relate to Cisco stuff.  It was the fact that what

12:19:19  6    Multiven was offering as a value proposition was, they

12:19:22  7    could come in and offer solutions that involved

12:19:28  8    multiple vendors, as opposed to a single type of

12:19:31  9    company.

12:19:33 10        Q.    So, the idea of being kind of a one-stop shop

12:19:37 11    for servicing your equipment?

12:19:39 12        A.    Yes.

12:19:39 13        Q.    That was the long range goal, as explained to

12:19:42 14    you by Multiven?

12:19:44 15        A.    Yes.

12:19:45 16        Q.    What do you think of that business plan given

12:19:48 17    your experience up to that point in time?

12:19:50 18        A.    I think it seemed like a good approach.  You

12:19:56 19    know, wasn't familiar with the market, not familiar

12:20:00 20    with the technology.  But, you know, I appreciate new

12:20:05 21    ideas and I appreciate people with a passion and an

12:20:07 22    entrepreneurial spirit that try to make a difference

12:20:12 23    with things.

12:20:13 24        Q.    Were you aware of any other, I'll call them

12:20:15 25    market entrants, that were pursuing a similar

12:20:21  1    opportunity that Multiven had been doing?

12:20:24  2        A.   No.

12:20:24  3        Q.   So, this was at least in your opinion at the

12:20:28  4    time a groundbreaking business idea?

12:20:30  5        A.   Yes.

12:20:43  6        Q.   With regard to Multiven's financials, I just

12:20:46  7    want to touch on a couple things I think you mentioned.

12:20:49  8    But before I do that, let me ask you a couple questions

12:20:53  9    about startups.

12:20:56  10            Were you familiar with startups at the

12:20:57  11   time you were looking at Multiven?

12:20:59  12       A.   No.

12:21:00  13       Q.   Did you have any notion as to what a startup

12:21:02  14   was?

12:21:02  15       A.   No.

12:21:04  16       Q.   Any thoughts that a startup would be a large

12:21:06  17   company?

12:21:08  18       A.   A large company?  No.

12:21:10  19       Q.   Startups usually are a couple of employees?

12:21:14  20       A.   Absolutely.  I think of them as starting out

12:21:16  21   of a garage.

12:21:17  22       Q.   So, even large companies like Google, Cisco,

12:21:22  23   Apple, all these started or at least -- started in a

12:21:27  24   garage somewhere?

12:21:28  25       MR. RYAN:  Objection.  Lack of foundation.  Lack

12:21:30 1    of personal knowledge.

12:21:34 2         THE WITNESS:  I have heard of a lot of success

12:21:36 3    stories with these large corporations that you find

12:21:40 4    people were, started as working out of a garage from HP

12:21:43 5    to Google to other companies.

12:21:45 6    BY MR. BIAL:

12:21:46 7         Q.   Would you have thought it unusual for an

12:21:48 8    employee as a startup to wear more than one hat, for

12:21:54 9    example, both a technical role, a marketing role, some

12:21:58 10   other leadership role?

12:21:59 11        A.   No.

12:22:09 12        Q.   To the extent there are revenue projections

12:22:13 13   for a startup, if those are based on contracts with new

12:22:18 14   customers, and the company is unable to secure those

12:22:24 15   contracts, would that be a factor in potentially having

12:22:29 16   some difficulty with success in the company?  Do you

12:22:34 17   understand my question?

12:22:35 18        A.   I think the way I understand your question

12:22:36 19   is, if you're a business, and you don't sell anything,

12:22:39 20   will that impact your business?  And I would say, yes.

12:22:48 21   Is that --

12:22:49 22        Q.   Yes, actually, it wasn't supposed to be a

12:22:52 23   complicated question.  It was actually the way I asked

12:22:54 24   it.  But you answered it.

12:22:56 25             With regard to Multiven, if you can

12:23:00  1   recall, what was the objective for the company in its

12:23:05  2   early stages, as far as trying to get customers?

12:23:11  3        A.   Well, the strategy changed a couple along the

12:23:16  4   way, the play.  Initially it's just trying to find an

12:23:22  5   opportunity to get in the door, to have somebody that

12:23:25  6   would take a chance, that would, you could put on your

12:23:30  7   resume to be able to use to open other doors.  So, as

12:23:37  8   we say in the Navy, any port in the storm.  You needed

12:23:42  9   something to get going.

12:23:48 10        Q.   And if that port is foreclosed to you, for

12:23:54 11   whatever reason, does that make the journey more

12:23:56 12   difficult?

12:23:57 13        A.   It can, depending on which way the storm is

12:23:59 14   going.

12:24:00 15        MR. RYAN:  Objection.  Vague and ambiguous.  Calls

12:24:02 16   for speculation.

12:24:05 17        MR. BIAL:  I like the analogy.

12:24:09 18         With a regard specifically to Multiven, was

12:24:12 19   securing contracts with new clients an important

12:24:15 20   part of the business?

12:24:16 21        A.   Yes.

12:24:15 22   BY MR. BIAL:

12:24:18 23        Q.   And if Multiven were unable to secure those

12:24:21 24   contracts, would that have been an impediment to

12:24:23 25   success?

12:24:24  1          A.    Yes.

12:24:25  2          Q.    You mentioned earlier that participants in

12:24:33  3     the industry were concerned about upsetting Cisco.

12:24:37  4          MR. RYAN:   Objection.   Mischaracterizes the

12:24:39  5     testimony.

12:24:44  6     BY MR. BIAL:

12:24:45  7          Q.    Do you recall what reference I'm talking

12:24:46  8     about here?

12:24:47  9          A.    I do.

12:24:48 10          Q.    I just want to get a little bit of

12:24:50 11     understanding what you meant by that, when you say

12:24:52 12     upsetting Cisco.   Are we talking about current

12:24:56 13     customers of Cisco, potential customers of Cisco?

12:25:01 14          A.    Yes.   As we talked about earlier, you know,

12:25:09 15     the businesses rely on their networks.   It's a critical

12:25:13 16     part of them being able to provide their service and

12:25:17 17     apply.

12:25:21 18                    And Cisco has a large share of the

12:25:24 19     market that impacts these networks.   And they are

12:25:32 20     providing a service that the customers are reliant on

12:25:36 21     to play.

12:25:38 22                    So, when you have that, you want to be

12:25:40 23     very careful not to disturb that, because that can

12:25:44 24     have an impact on your business.

12:25:51 25          Q.    And the nature of the perceived fear of Cisco

12:25:54  1    would be, if you did upset them, you may not get the

12:25:58  2    continued access to their services?

12:26:01  3         MR. RYAN:  Objection.  Calls for speculation.

12:26:02  4    Mischaracterizes the testimony.

12:26:05  5         Q.   Do you understand my question?

12:26:07  6         A.   I understand your question.  I think that

12:26:16  7    from the perspective within Multiven, as we were

12:26:20  8    looking at what was maybe preventing the opportunity

12:26:23  9    for sales, that people didn't want to take the risk of

12:26:31 10    not being able to have Cisco in the event that they

12:26:34 11    needed them.

12:26:36 12    BY MR. BIAL:

12:26:37 13         Q.   Were these conversations with customers at

12:26:40 14    the time trying to get new business?

12:26:44 15         A.   This is what I got from those people that

12:26:46 16    were out trying to sell the information.  I didn't get

12:26:49 17    that firsthand from the customers.

12:26:51 18         Q.   People from Multiven reporting back as

12:26:52 19    somebody --

12:26:54 20         A.   Yes.

12:26:54 21         Q.   -- that when they were on the sales visits,

12:26:56 22    they were getting some resistance from customers

12:26:59 23    because of Cisco's dominance.

12:27:02 24         MR. POTEPAN:  Objection.  Mischaracterizes the

12:27:03 25    testimony.

12:27:04  1      MR. BIAL:  I'm asking the question.  I'm not

12:27:06  2  asking about his testimony.

12:27:07  3       You can answer the question.

12:27:09  4      THE WITNESS:  Yes.  The onus really on Multiven

12:27:16  5  is, they have something that is working.  They are

12:27:19  6  comfortable with it.  You're coming in and offering me

12:27:23  7  something new.  I need to understand the value

12:27:26  8  proposition and I know that I need to feel comfortable

12:27:29  9  it's not going to impact my ability to perform my

12:27:32 10  primary business as my primary mission as a business.

12:27:37 11  It's a valid concern for a business.

12:27:40 12  BY MR. BIAL:

12:27:40 13      Q.   Sure.  Some of the things they would think

12:27:42 14  about, were what you think I pointed to earlier,

12:27:45 15  security concerns, for example.  I believe Mr. Ryan

12:27:49 16  questioned you on this.  Security might be one of the

12:27:53 17  things that a customer might be keen to make sure that

12:27:55 18  was preserved after new relationship?

12:27:57 19      A.   Security, response time, reliability,

12:27:59 20  dependability or obviously key performance parameters

12:28:07 21  that business would be concerned about in running their

12:28:10 22  networks.

12:28:11 23      Q.   In your experience did companies always not,

12:28:16 24  any company, not just Multiven, whatever companies in

12:28:19 25  the industry, did they always live up to your

12:28:22  1    expectations?

12:28:25  2         A.    In the IT industry?

12:28:27  3         Q.    Right.  Let's say service of networking

12:28:31  4    equipment.

12:28:32  5         A.    You know, I'm not a good one to ask because

12:28:35  6    I'm not one that has been responsible or relying on the

12:28:38  7    networks to play.  I know when a network is not

12:28:42  8    working, and I'm trying to do my job, it's frustrating.

12:28:50  9    But that's not a matter of -- I guess, as a customer,

12:28:55 10    my expectation is that network is always going to work.

12:29:00 11         Q.    If there were specific problems about

12:29:02 12    service, you wouldn't be the person that would deal

12:29:05 13    directly with those issues?

12:29:07 14         A.    That's correct.

12:29:07 15         Q.    With regard to a value proposition, in

12:29:09 16    addition to providing services, is price a factor?

12:29:14 17         A.    Yes.

12:29:19 18         Q.    Would you be inclined to consider less

12:29:21 19    expensive alternatives from an upstart company?

12:29:26 20         A.    Absolutely.

12:29:29 21         Q.    Had you in your business experience made

12:29:33 22    decisions based on price?

12:29:34 23         A.    Yes.

12:29:36 24         Q.    Have you made decisions made on price with an

12:29:39 25    upstart trying to get new business, if you can recall?

12:29:50   1        A.   Yes.   I mean I'll take -- can take this from

12:29:53   2   a personal side or from my government side.   One of the

12:29:57   3   things that we try to do in government contracting is

12:29:59   4   to promote small businesses and entrepreneurs.

12:30:04   5             It's mandated in the Federal

12:30:06   6   Acquisition Regulations that you have to do certain

12:30:09   7   set sides for small businesses, because it's

12:30:13   8   perceived as a way to help stimulate the economy,

12:30:16   9   create new ideas and promote the American way of life

12:30:20  10   to keep small businesses up and running.

12:30:24  11             So, yes, I mean I think it's a good

12:30:28  12   idea.   If you don't, if small businesses don't think

12:30:31  13   they have an opportunity to bring new and innovative

12:30:34  14   ideas, will stifle the American ingenuity.

12:30:42  15        Q.   Have you ever heard of SMARTnet?

12:30:45  16        A.   Yes.

12:30:46  17        Q.   Are you aware it's a Cisco service?

12:30:52  18        A.   I guess, yes.   I'm aware of it.   As you tell

12:30:56  19   me more, I'll probably -- I know that we actually have

12:31:02  20   talked about that.   I have heard about it before.

12:31:05  21        Q.   Sure.   So, if Cisco offers a service to

12:31:13  22   update its software, you can use the SMARTnet which

12:31:17  23   would be their brand as a fix it software.

12:31:24  24        A.   Okay.

12:31:25  25        Q.   You are not familiar with it in the context

12:31:26  1    for software fixes?

12:31:28  2         A.   No.

12:31:55  3         Q.   At the time you joined Multiven's board, did

12:31:59  4    you believe it was a real company?

12:32:01  5         A.   Yes.

12:32:02  6         Q.   Did you think it was a sham company?

12:32:04  7         A.   No.

12:32:07  8         Q.   Do you think that Mr. Olson would recommend

12:32:09  9    you joining the board of a sham company?

12:32:12 10         A.   No.

12:32:26 11         Q.   What was your relationship with Cisco at the

12:32:29 12    time you were on Multiven's board of directors?

12:32:41 13         A.   I didn't have a specific relationship with

12:32:43 14    him.

12:32:46 15         Q.   You were still in touch with Mr. Olson

12:32:49 16    throughout the time you were on the board of directors?

12:32:52 17         A.   Yes.

12:33:28 18         Q.   Had Ms. Deka shared more financial

12:33:31 19    information with you during the period that you were a

12:33:35 20    board member, would that have impacted your decision

12:33:38 21    you think whether to leave the board of directors?

12:33:41 22         A.   It would have been one less thing to cause me

12:33:47 23    concern, if I felt more comfortable with the financial

12:33:50 24    situation.

12:34:13 25         Q.   You mentioned that the Secret Service

12:34:14  1   contacted you.  Do you recall that?

12:34:18  2        A.   Yes.

12:34:20  3        Q.   I think you said that it was related to some

12:34:23  4   information that Cisco had asked about?

12:34:25  5        A.   Yes.

12:34:26  6        Q.   So, the Secret Service agent specifically

12:34:29  7   mentioned that Cisco had provided some information to

12:34:32  8   the Secret Service?

12:34:36  9        MR. RYAN:  Objection.  Lack of foundation.

12:34:43  10       THE WITNESS:  In the discussion with the Secret

12:34:44  11  Service that Cisco's name came up and -- but I can't

12:34:55  12  say for sure that they said that Cisco provided them

12:34:58  13  information.

12:35:08  14  BY MR. BIAL:

12:35:08  15       Q.   Do you recall the name of the Secret Service

12:35:11  16  officer that you spoke to?

12:35:13  17       A.   No, I don't.

12:35:14  18       Q.   Do you know what it was Kati Kurtz?

12:35:17  19       A.   That name sounds familiar.  I know it was a

12:35:20  20  female.

12:35:20  21       Q.   When did that conversation occur.  The more

12:35:26  22  specificity with that the best on this question.

12:35:28  23       A.   I'm sorry.  I might get close by saying, a

12:35:32  24  year ago.

12:35:37  25       Q.   Do you have any documents or anything that

12:35:39  1  might help us pin down when that communication took

12:35:43  2  place?

12:35:55  3      A.   I'm trying to think if maybe I have a

12:35:57  4  calendar entry or something perhaps.

12:36:03  5      Q.   Let me suggest, if you have that information,

12:36:05  6  we would like to get it, avoid having to go through

12:36:11  7  formal process.  But if you have it, would you be happy

12:36:12  8  to volunteer --

12:36:14  9      A.   Yeah, more than happy to provide that.  I

12:36:16 10  just don't know where I would have documented it, you

12:36:20 11  know.  It came as a voice mail.  I mean -- yes.  And

12:36:26 12  then I actually -- it was actually good because I

12:36:32 13  called back to make sure that the people were answering

12:36:34 14  the phone at least identified themselves as Secret

12:36:36 15  Service, because I couldn't understand why the Secret

12:36:39 16  Service would be calling me.

12:36:46 17      Q.   Do you still believe the multi-vendor

12:36:49 18  approach to servicing equipment is a good idea?

12:36:54 19      A.   Based on my understanding of it, I think it

12:36:56 20  does have a lot of merit.

12:37:26 21      MR. BIAL:  Mr. Gray, I would like to thank you for

12:37:28 22  coming in for your deposition.  We don't have any

12:37:30 23  further questions at this time.  If we need to follow

12:37:32 24  up with you later, I will make arrangements to do so.

12:37:35 25      MR. RYAN:  I have a couple of follow up.  Real

12:37:37  1   quick.

12:37:37  2                      EXAMINATION

12:37:38  3   BY MR. RYAN:

12:37:39  4       Q.   You mentioned that at the time you joined the

12:37:41  5   board, you didn't think Multiven was a sham company?

12:37:45  6       A.   Correct.

12:37:46  7       Q.   At some point did you change your view?

12:37:58  8       A.   There were points where I would have doubts,

12:38:01  9   but I was never completely -- completely convinced that

12:38:07 10   it was a sham.

12:38:10 11       Q.   So, at some point you had doubts about

12:38:13 12   whether it was a legitimate company, correct?

12:38:14 13       A.   Yes.

12:38:17 14       Q.   You mentioned pricing could be a factor in

12:38:21 15   deciding whether somebody is going to contract --

12:38:24 16       A.   Yes.

12:38:24 17       Q.   Do you know what life cycle pricing is?

12:38:29 18       A.   I have an idea.

12:38:32 19       Q.   What about total cost of ownership?

12:38:34 20       A.   Very familiar with that.

12:38:40 21       Q.   The purchases that you have been involved in,

12:38:43 22   is that concept something very important to making a

12:38:45 23   decision whether to enter into a contract with a

12:38:48 24   vendor?

12:38:49 25       A.   It's become a lot more important over the

12:38:52  1   last couple of years.  And I'm specifically working on

12:38:57  2   that for DOD to help improve that decision making.

12:39:01  3        Q.   What is total cost of ownership?

12:39:07  4        A.   The way that the Department of Defense

12:39:10  5   calculates it is the total of all cost associated with

12:39:16  6   acquiring, supporting and disposing of a piece of

12:39:21  7   equipment.

12:39:22  8        Q.   That would include servicing it during its

12:39:24  9   lifetime?

12:39:25 10        A.   Yes.

12:39:26 11        MR. RYAN:  No further questions.  Thank you for

12:39:28 12   your time.

12:39:30 13        VIDEO OPERATOR:  This concludes the deposition at

12:39:33 14   12:39.

         15             (At 12:39 P.M., the deposition

         16             proceedings adjourned.)

         17

         18

         19        _____

         20                    BASIL GRAY

         21

         22

         23

         24

         25

1     STATE OF MARYLAND    )

2                       )   ss.

3     DORCHESTER COUNTY    )

4

5             I, hereby certify that the witness in the

6     foregoing deposition, BASIL GRAY, was by me duly sowrn

7     to testify to the truth, the whole truth, and nothing

8     but the truth, in the within-entitled cause; that said

9     deposition was taken at the time and place herein

10    named; that the deposition is a true record of the

11    witness's testimony as reported by me, a duly certified

12    shorthand reporter and a disinterested person, and was

13    thereafter transcribed into typewriting by computer.

14           I further certify that I am not interested

15    in the outcome of the said action, nor connected with,

16    nor related to any of the parties in said action, nor

17    to their respective counsel.

18           IN WITNESS WHEREOF, I have hereunto set my

19    hand this 18th day of June, 2010.

20

21

22

23                    Ronald E. Bennett

24                    RONALD E. BENNETT,

25                    STATE OF MARYLAND